## ENELOW v. NEW YORK LIFE INS. CO.*
### No. 5876.

Circuit Court of Appeals, Third Circuit.
March 26, 1936.

Charles H. Sachs, Louis Caplan, and Sachs & Caplan, all of Pittsburgh, Pa., for appellant.

William H. Eckert and Smith, Buchanan, Scott & Gordon, all of Pittsburgh, Pa., for appellee.

Before BUFFINGTON, DAVIS, and THOMPSON, Circuit Judges.

BUFFINGTON, Circuit Judge.

In the court below Mrs. Sarah Enelow, the beneficiary in an insurance policy on the life of her husband now deceased, brought suit against the New York Life Insurance Company to recover on its policy. The insurance company's defense was fraud in the procurement of the policy. After proofs, both sides prayed binding instructions. The court affirmed the defendant's point, which was that the jury should find for the plaintiff only for the return of premiums paid. On entry of judgment for such sum in its favor, plaintiff took this appeal. Both sides having asked for instructions in their favor, the facts were left to the court to decide and its findings are conclusive. Beuttell v. Magone, 157 U.S. 154, 15 S.Ct. 566, 39 L.Ed. 654.

From the record it appears the policy provided: "This contract is made in consideration of the application therefor and of the payment of the premiums." It further states: "The policy and the application therefor, copy of which is attached hereto, constitute the entire contract." On the sheet to which a photostatic copy of the application is attached is this cautionary notice:

"Note

"This copy should be carefully examined and if any error or omission is found, full particulars, with the number of the policy, should be sent immediately to the Home Office of the Company, No. 51 Madison Avenue, Madison Square, New York, N. Y."

In his signed application for the policy the following questions and replies are made:

"7. B. Have you ever been under observation or treatment in any hospital, asylum or sanitarium? No.

"8. Have you ever consulted a physician or practicioner for or suffered from any ailment or disease of

"A. The Brain or Nervous System? No.

---

*Certiorari denied by Supreme Court 56 S. Ct. 948, 80 L. Ed. ——.

"B. The Heart, Blood Vessels or Lungs? No."

"10. Have you ever consulted a physician or practicioner for any ailment or disease not included in your above answers? No.

"11. What physicians or practicioners, if any, not named above, have you consulted or been examined or treated by within the past five years? None."

These answers were false. The pleadings show: "From July 6, 1930 until July 25, 1930, said Max Enelow was in the Montefiore Hospital of Pittsburgh for observation. In September, 1928, and again from November 26, 1928, until December 5, 1928, said Max Enelow consulted and was examined by Dr. Milton Goldsmith. From December 6, 1928, until December 14, 1928, said Max Enelow consulted and was examined by Dr. Clement R. Jones. On February 17, 1930, said Max Enelow consulted and was examined by Dr. Milton Goldsmith. During the months of July, August and September, 1930, said Max Enelow consulted and was examined and treated by Dr. Leo H. Criep. At various times during the year 1931, said Max Enelow consulted and was examined and treated by Dr. W. A. Clark. All of the doctors named in this paragraph are physicians or practicioners."

In addition, the proofs by Dr. Criep were that he first saw Mr. Enelow at his home July 5, 1930, and took care of him "over a period of two or three months."

"The final diagnosis was coronary disease accompanied by heart failure of the anginoid type, a right inguinal hernia, and premature beats.

"Q. Doctor, what was the history that you received from Max Enelow when you were called to his home on July 5, 1930? A. At that time he stated he had pain in the chest; he hadn't been well for about three months; there were attacks of shortness of breath, usually on walking or on excitement; and he thought he had indigestion.

"Q. Then what did you do with Max Enelow, Doctor? A. There being some doubt as to the exact diagnosis, I advised hospitalization, and the patient was sent to the hospital the following day.

"Q. That would be on July 6, 1930? A. Yes, sir.

"Q. And he continued there until when? A. He was in the Montefiore Hospital from July 6th until July 25th.

"Q. 1930? A. 1930.

"Q. And who had charge of his case there? A. I did.

"Q. And what did you do with him while you had him in the hospital for those nearly three weeks? A. He was thoroughly examined physically, and we X-rayed his heart, had an electrocardiagram taken, and the usual urine and the blood examinations were made.

"Q. What did your X-ray of his heart disclose, if anything? A. The X-ray disclosed an enlargement of the heart and the great vessels.

"Q. Do you know how often you saw him while he was in the hospital? A. I saw him daily.

"Q. Daily from July 5th until July— A. From July 6th until July 25th, including those dates.

"Q. And then did you continue to see him at home for some time after that, did you say? A. Yes, I saw him at intervals at home until September 29, 1930.

"Q. Will you describe to the Court and jury what you mean by coronary disease, please? A. Coronary disease is an involvement of the blood vessels which supply the heart with nourishment—with blood—interfering with that blood supply.

"Q. What is the relationship between coronary disease and cardiac sclerosis? A. One form of coronary disease is sclerosis. By sclerosis we mean a hardening of blood vessels—a hardening of the wall of blood vessels, and a replacement of vital tissues which are present in the wall of blood vessels with fibrous tissue; and as the wall of the artery is thickened the opening is narrowed, and because the opening is narrowed the blood supply is less than what it should be."

He further stated he told Enelow he had a weakness of the heart; that he attended him until his death, May 27, 1933; and that the cause of his death was the same trouble he had found him suffering from for the three preceding years.

■ From the above and other proofs in the case, the trial judge was justified in giving binding instructions in that regard, or, as stated by him in refusing a new trial: "Under the admitted representations made by the insured, which were material, there was no question as to their falsity to be submitted to the jury."

■ But in spite of the fact of the fraud of the insured in falsely misstating material

facts, it is contended the insurance company is prevented, by noncompliance with a statute of Pennsylvania, from showing such fraud. In that regard the state statute (40 P.S.Pa. § 441) provides: "All insurance policies * * * in which the application of the insured * * * form part of the policy or contract * * * shall * * * have attached to said policies, correct copies of the application as signed by the applicant * * * and, unless so attached and accompanying the policy, no such application * * * shall be received in evidence." In the present case a photostatic copy of the application to the company and of the answers to the medical examiner was attached to the policy. The copy was reduced in size, and the plaintiff contends that it was not a copy of the original on account of its diminished size and alleged illegibility. It will be noted that the statute which refers to life insurance makes no provision as to what shall constitute a copy and undoubtedly the photostat was in fact a copy of the original, in that respect differing from the specification made in the statute referring to casualty insurance, which is that the "attached papers shall be plainly printed in type of which the face shall be not smaller than ten point." Was the trial judge in error in admitting this application in evidence to show the fraud perpetrated. That depends on whether the copy satisfied the statute. As a matter of fact, the photostatic copy in large-sized letters heads itself as being part I of "Application to the New York Life Insurance Company," and in equally legible letters as being part II, "Application to the New York Life Insurance Company, Answers to the Medical Examiner." Near the head of the copy and in perfectly legible letters is the "Note" heretofore printed. Confronted by this caution, the insured accepted the pol-

icy, kept it for some eighteen months, and made no complaint that it was illegible, and the trial judge, in denying the motion for a new trial, said: "The policy was offered in evidence. I have been able to read what is set forth in this application without any particular difficulty except as to a few words therein. The questions and the answers, which are the subject of the defense, were read by me with very little, if any, difficulty and without the use of magnifying glasses."

We have not overlooked the case of New York Life Ins. Co. v. Halpern (D.C.) 57 F.(2d) 200, this court 61 F.(2d) 1037, and the contention made by counsel that a photostat of the character involved in this suit has been held insufficient under the statutes of Pennsylvania by this court. We do not so regard it. Reference to the opinion of the trial judge, 57 F.(2d) 200, on page 204, shows his finding of fact was that no fraud was committed; his language being: "Being of opinion that the proof in the instant case is not sufficiently strong and convincing to justify a finding of fraud on the part of the insured in obtaining the policies in suit, we shall dismiss the bill." Such finding justified his dismissal of the bill. On the appeal this court in its opinion did not discuss the photostatic copy, but affirmed the case on Judge Gibson's fact finding, stating: "The findings of fact are fully supported by the evidence produced in the court below, and, since we find no error in the conclusions of law, the decree dismissing the bill of complaint is affirmed, with costs."

The absence of fraud justified the affirmance of the case and made it unnecessary to discuss and decide the sufficiency of the photostatic copy.

Finding no reversible error in the record, the judgment below is affirmed.