Sylvia **OSTROV**

v.

**METROPOLITAN LIFE INSURANCE COMPANY.**

**Civ. A. No. 31520.**

United States District Court
E. D. Pennsylvania.
Sept. 30, 1966.

H. P. Abramson, Philadelphia Pa., for plaintiff.

Dechert, Price & Rhoads, by Arthur W. Leibold, Jr., and Owen B. Rhoads, Philadelphia, Pa., for defendant.

HIGGINBOTHAM, District Judge.

## OPINION

The instant matter is before this Court on the motion of the plaintiff, Sylvia Ostrov, for judgment n. o. v., or in the alternative, a new trial. Jurisdiction is founded on diversity of citizenship between the parties. This case was tried before a jury, on December 2, 3 and 6, 1965. As to plaintiff's claim for payment on the $50,000 insurance policy, the jury returned a verdict favorable to the defendant on the basis of two special interrogatories submitted to them by the Court. Judgment was entered for the plaintiff in the sum of $3,482.26, which was the total amount plaintiff had paid to the defendant insurance company in premiums. For the reasons which follow both of plaintiff's motions must be denied.

## STATEMENT OF FACTS

Plaintiff, Sylvia Ostrov, was the wife of Nathan Ostrov. From January 17, 1957 to the date of his (Part A) application of August 11, 1959 for a $50,000 insurance policy from defendant, plaintiff's decedent had been receiving continuous medical examinations, laboratory tests, electrocardiograms and consultations by medical specialists because of a variety of complaints, illnesses and symptomatology. On August 18, 1959, a week after the original application, Nathan Ostrov executed Part B which contained his answers to various questions pertaining to his past and present medical history. The falseness of his answers and their significance will be subsequently discussed; however, in response to the answers given by Nathan Ostrov, the defendant prepared a policy—which though prepared was not issued. This policy was to be *owned* by Nathan Ostrov, and the plaintiff was named the primary beneficiary. On August 31, 1959, the Ostrovs signed a form which was entitled "Owner Form" and signed a request for Check-O-Matic (the latter being a mode for the payment of premiums). The "Owner Form" named the plaintiff, Mrs. Ostrov, as the owner of

the policy, and contained the following language:

It is understood and agreed that (1) except as otherwise provided above and in (2) below, all the statements and answers subscribed to by the Life Proposed on the * * * day of * * * 19 * * *, including the statements and answers referred to in Item 1 of the agreements therein and the statements below when and as completed and signed by the Life Proposed shall, together with this application, form the basis of the contract of insurance herein applied for, if one be issued, without affecting the use of the said basic application as the application for any other policy.

On September 15, 1959, policy No. 24,-175,691A was delivered to the Ostrovs and became effective. At that time they [the Ostrovs] signed both the original and a photostatic copy of an Application Amendment which filled the blank date on the "Owner Form" and contained the following language:

The undersigned hereby amends the application for Life Insurance made to your Company on the date stated above * * *

By stating the date on which the basic application was signed by the Life Proposed as August 11, 1959.

These amendments and declarations are to be considered as a part of the said application and subject to the agreements, covenants, and statements therein contained. The said application, together with these amendments, is to be considered as the basis of and as a part of the contract of insurance. The said application, as amended, is correct and true, and I hereby ratify and confirm the statements therein made as of the date hereof.

Attached to the policy, at the time this amended application was signed, were all the documents signed by the Ostrovs, jointly, or by the decedent alone, with the exception of the request for a Check-O-Matic. In Part B of the "basic application" the decedent gave answers to the

medical questionnaire, which, at the trial, were shown to be patently and wilfully false. These answers will be discussed at greater length below.

On June 27, 1961, Nathan Ostrov died and the plaintiff then sought to collect the value of the policy. The defendant refused payment, on the ground that the decedent had misrepresented his medical history, and tendered to the plaintiff the total value of premiums paid. Mrs. Ostrov then brought this action. On November 14, 1964, plaintiff filed a Motion for Judgment on the Pleadings which was denied by Judge C. William Kraft, Jr.

Evidence introduced at the trial conclusively proved that the following questions in the Part B application of August 18, 1959, were falsely answered "No":

Question: Have you ever been a patient in or visited a hospital, clinic, dispensary or sanitarium for observation, examination or treatment?

Answer: No.

Question: Have you ever had or been advised to have a surgical operation?

Answer: No.

Question: Have you ever been advised to modify or restrict your eating, drinking or living habits because of any health condition?

Answer: No.

Question: Do you have periodic physical examinations or checkups?

Answer: No.

Question: Have you ever had an electrocardiogram or x-ray examination or any laboratory examination or tests?

Answer: No.

Question: Have you ever consulted any physician, healer or other practitioner within the past five years for any reason not mentioned above?

Answer: No.

As the answers above demonstrate, Nathan Ostrov denied that he had ever been a patient in, or visited a hospital or clinic for observation, examination or treatment; denied that he had been advised to have a surgical operation; denied that he had had periodic physical examinations; denied that he had had electrocardiogram or x-ray examination or any laboratory examination or test; denied that he had "consulted any physician or other practitioner within the past five years for any reason" not previously mentioned above. In every respect, his answers were false. The record of this case clearly establishes the following:

Dr. Seymour Siegel, a certified internist, testified that Nathan Ostrov was first seen by him on January 17, 1957, for weight control and reduction (N.T. 60; Ex. D–1). On February 11, 1957, Mr. Ostrov had some chest pain, and an EKG was performed (N. T. 60, 80; Exs. D–1, D–1–M). Thereafter, Dr. Siegel examined Nathan Ostrov because of his weight condition on February 18, June 11, June 27 (patient requested to control food intake and medication prescribed), July 1, July 11, July 30, October 29, November 5, November 19, and November 25, 1957 (N.T. 60–62; Ex. D–1); February 18, March 4, March 25, April 1, April 22, June 30, July 15, August 5, August 26, and December 29, 1958 (N.T. 62–63; Ex. D–1); and January 13, 1959 (N.T. 63; Ex. D–1).

Dr. Siegel saw Nathan Ostrov on February 21, 1959, when he complained of pain in his left side (Ex. D–1). Dr. Siegel had a blood count, blood platelet count and a urinalysis performed on that date (N.T. 63, 66–68; Exs. D–1–C, D–1–D). He saw Mr. Ostrov again on February 23, 1959 (N.T. 68; Ex. D–1). An EKG was performed on February 25, 1959 (N.T. 80; Ex. D–1–N), and barium, mercury and kidney x-rays were performed at Germantown Hospital at his request on February 26, 1959 (N.T. 80–81; Ex. D–1–L).

Mr. Ostrov was again seen by Dr. Siegel on March 10, 1959, when he still had pain in the left upper quadrant (N.T. 68; Ex. D–1–A) and on May 25, 1959, when he complained of a headache (N.T. 70; Ex. D–1–A).

A G.I. series, stomach X-rays and a head X-ray were ordered at that time (N.T. 70–71; Exs. D–1–H, D–1–I). Although Dr. Siegel made diagnoses of an enlarged spleen and a stomach ulcer (N.T. 72; Ex. D–1–A), he informed Mr. Ostrov that he had a "liver" condition (N.T. 87–88). He also referred Mr. Ostrov to Dr. Lawrence Beizer, a hematologist (N.T. 81).

Although Dr. Beizer saw Mr. Ostrov on May 29, 1959 (Ex. D–2), Dr. Siegel continued to examine and treat Nathan Ostrov. He saw him on June 9, 1959 (N.T. 72; Ex. D–1–A), June 16, 1959 (N.T. 73; Ex. D–1–A) (supervision of medication prescribed by Dr. Beizer), June 22, 1959, when a blood count was performed (N.T. 74; Exs. D–1–A, D–1–F), June 29, 1959 (N.T. 74; Exs. D–1–A, D–1–E) (supervision of medication and blood test), July 20, 1959 (N.T. 74–75; Ex. D–1–A) (cramps in valves, occational headaches, medication—two tablets, three times per day), August 18, 1959 (N.T. 75, 86; Ex. D–1–A), August 27, 1959, when a blood count was ordered (N.T. 75; Exs. D–1–A, D–1–G), August 31, 1959, when Mr. Ostrov complained of cramps in his fingers (N.T. 76; Ex. D–1–A). August 31, 1959, was the date of the last examination or treatment by Dr. Siegel prior to issuance of the policy on September 15, 1959 (N.T. 79), although Dr. Siegel continued to treat Mr. Ostrov through February 28, 1961 (N.T. 169; Ex. D–1–B).

As stated above, Nathan Ostrov first saw Dr. Beizer on May 29, 1959 (Ex. D–2). On that day, a blood test was performed in Dr. Beizer's office (Ex. D–3), a special hematology study was run at Graduate Hospital (N.T. 140; Ex. D–4), and bone marrow was removed from Mr. Ostrov's sternum (Exs. D–2, D–5). On June 3, 1959, a lymph node was removed from the right cervical area (Exs. D–2, D–6, D–14; N.T. 137, 139).

Dr. Beizer, prior to the effective date of the policy, examined Nathan Ostrov on June 8, July 13, July 27, August 3, August 10, August 21, September 2 and September 14, 1959 (Ex. D–2). Blood tests were performed in Dr. Beizer's office on June 8, June 22, June 29, July 13, July 27, August 3, August 10, August 21, September 2 and September 14, 1959 (Ex. D–3).

Dr. Beizer kept Dr. Siegel advised of his examinations and treatments by letters dated August 4, August 12, August 27 and September 9, 1959 (Exs. D–7, D–1–O; D–8, D–1–P; D–9, D–1–Q; D–10–, D–1–R).

Subsequent to Nathan Ostrov's death on June 27, 1961, Dr. Beizer certified the cause of death as chronic lymphosytic leukemia of 2 years duration (Ex. D–15).

In summary, Nathan Ostrov had seen Dr. Seigel 12 times in 1957, 10 times in 1958, and 12 times in 1959 prior to the effective date of the policy, and Dr. Siegel had prescribed head, stomach and kidney X-rays, an EKG, a G.I. Series, blood tests and a urinalysis.

Interestingly enough, the day before Nathan Ostrov's execution of Part B, Dr. Siegel testified that Mr. Ostrov had visited him, and "at that time he had cramps in his calves, occasional headaches. The spleen continued to be enlarged and he was continuing on the medication * * * the medication is given in large doses at first and slowly tapered off so that at all times he was probably taking it perhaps three times a day, but the aim was to wean him away from it."

I.

MOTION FOR JUDGMENT N.O.V.

In support of her motion for judgment n. o. v., the plaintiff contends: (a) that she did not sign each and every application document thus, the requirements of section 318 of the Pennsylvania Insurance Code, 40 P.S. § 441, were not met and the application documents could not be introduced into evidence; (b) the unsigned documents cannot be incorporated by reference into the signed application; and (c) that the request for a Check-O-Matic signed by her was an

application document and since defendant failed to attach a copy thereof to the policy, then all the application documents are inadmissible and the policy alone is the entire contract.

## SIGNATURE REQUIREMENT

 Section 318 of the Insurance Code (40 P.S. § 441), on which the plaintiff relies, reads as follows:

All insurance policies, issued by stock or mutual insurance companies or associations doing business in this State, in which the application of the insured, the constitution, by-laws, or other rules of the company form part of the policy of contract between the parties thereto, or have any bearing on said contract, shall contain, or have attached to said policies, correct copies of the application as signed by the applicant, or the constitution, by-laws, or other rules referred to; and, unless so attached and accompanying the policy, no such application, constitution, or by-laws, or other rules shall be received in evidence in any controversy between the parties to, or interested in, the policy, nor shall such application, constitution, by-laws, or other rules be considered a part of the policy or contract between such parties.

The plaintiff argues that since she did not sign all of the documents which were part of the application, the requirements of the Insurance Code were not complied with. This contention was first argued before Judge Kraft[1] on the plaintiff's motion for judgment on the pleadings and before me at trial. It was rejected on both occasions, and it must be rejected now. The plaintiff has cited several cases which she contends support her position; however, after giving them a careful reading I have concluded that they do not support the position contended for by her.

In Fidelity and Casualty Co. of New York v. Howe, 38 F.2d 741 (3 Cir. 1930), cert. denied, 281 U.S. 765, 50 S.Ct. 464, 74 L.Ed. 1173 (1930), the application was never signed by the applicant. The *Howe* case differs from the instant one, in that here the applicant did indeed sign the amended application which purported to incorporate other forms by reference, whereas in *Howe* no application was ever signed.

In Robson v. Pennsylvania Mutual Live Stock Ins. Co., 57 Pa.Super. 491 (1914) the entire application was excluded because no copy of the application was attached to the policy and it was unsigned by the applicant. Syme v. Bankers National Life Ins. Co., 393 Pa. 600, 144 A.2d 845 (1958) does not lend support to the plaintiff because in that case the insurance company added information to the application after it was signed by the applicant. Thus, the application was not a "correct copy" as signed by the applicant.

1. The defendant contended that Judge Kraft's ruling on this question constituted "the law of the case", this the plaintiff strenuously denies, citing Schaffran v. Mt. Vernon-Woodberry Mills, Inc., 70 F.2d 963, 94 A.L.R. 543 (3 Cir. 1934). At the trial I stated that I was in accord with Judge Kraft's rulings and would follow them. The following is an excerpt from my ruling on the matter on December 2, 1965. (N.T., p. 4, December 2, 1965):

The Court: Gentlemen, without going into the issue of whether Judge Kraft's opinion is the law of the case and that I am obligated to follow it, I have read through your briefs which have been very helpful and I am going to follow Judge Kraft's opinion. So that the rulings which he made on that phase will be equally applicable here.

Mr. Abramson: I am sorry, I don't hear so well. I didn't get—

The Court: Judge Kraft's opinion as was filed on your motion for judgment on the pleadings—

Mr. Abramson: Yes.

The Court:—the rulings he made there, or the holdings he made I am following. Not necessarily on the rationale that because he so ruled that I am obligated to follow it, but because I concur with the conclusions of law he gave. So, that accordingly you will have to make your opening in accordance with the rationale —Whether or not Judge Kraft's opinion was the "law of the case", by adopting his conclusions I believe that I have obviated any difficulties in that regard.

In Zimmer v. Central Accident Ins. Co., 207 Pa. 472, 56 A. 1003 (1964) the issue involved was not the same as the one here. There the application on the back of the policy was not the same one signed by the insured. In addition the Court struck down a defense based on a provision printed on the policy which stated:

"I accept this as a copy of my application, but I agree that the original shall be admitted as the correct application if copy varies therefrom." 207 Pa. at 477, 478, 56 A. at 1005.

The Court held that the insured had not committed himself to that provision because he had not signed it. Whether such a provision could have bound him if he had signed it the Court did not say.

Finally, the plaintiff places great emphasis on the holding in Tables v. Metropolitan Life Ins. Co., 202 F.Supp. 547 (W.D.Pa.1962). In Tables, the applicant signed Part A of an application for one insurance policy in January of 1958. The insurance company accepted the application and issued a policy backdated to December 23, 1957. In February of 1958 the applicant sought an additional policy. The application for that policy contained a clause wherein the applicant agreed that Parts A and B of the application for the first policy should form the basis for the second, if it was issued. After the death of the insured, the beneficiary brought suit against the insurance company to recover the value of the second policy. The company defended on the basis of fraudulent misrepresentations made in the application. The plaintiff moved for judgment on the pleadings arguing that the insurance company could not rely on the application for the first policy since it had not been attached to the policy (the second) when issued. The Court denied the motion noting that:

It seems to the court that on the present motion, an issue of fact has been raised because, defendant says, an application signed by the insured is attached to the policy even though part

of it is incorporated by reference. If, in fact, however, the application for additional insurance which is a one page document approximately 6″ x 8½″ in size did not have attached to it at the time decedent signed it on February 18, 1958, the first application * * * then plaintiff's position would appear to be consistent with the Supreme Court decisions and the statute and she would be entitled to judgment. *If, on the other hand, both documents were before the insured at the time he executed the application for the additional insurance* (the policy in suit) *then it would appear that the statute had been complied with.* Such is the factual issue which prevents judgment at this stage of the case. (p. 549). (Emphasis added.)

When carefully analyzed, *Tables* does not give any support to the plaintiff's arguments. The Court did not hold that all application documents must be signed if the insurance company seeks to introduce any of them into evidence, rather the thrust of its argument would appear to indicate that where all previous documents are attached to the application they may be incorporated therein, even if unsigned.

## INCORPORATION BY REFERENCE

The plaintiff next contends that the unsigned documents (unsigned, that is, by her, for they were signed by Nathan Ostrov) could not be incorporated by reference into her signed application. Although there is scant authority on this question, I am compelled to reject this contention. In order to resolve this issue it would be helpful to understand the factors which motivated the Legislature to pass § 318. These reasons were carefully stated by the Supreme Court of Pennsylvania in Syme v. Bankers National Life Insurance Co., supra. There the Court said:

" * * * 'It is well known that the evil aimed at in this legislation was the custom of insurance companies to put in their blank forms of application long and intricate questions or state-

ments to be answered or made by the applicant, printed usually in very small type, and the relevancy or materiality not always apparent to the inexperienced, and therefore liable to become traps to catch even the innocent unwary. *The general intent was to keep these statements before the eyes of the insured, so that he might know his contract, and if it contained errors, have them rectified before it became too late.'"* (393 Pa. pp. 606–607, 144 A.2d p. 849). (Emphasis added)

What was done in the instant case clearly conformed to the intention of the Legislature as expressed by the Courts, for when Mrs. Ostrov signed the amended application all of the other forms were attached to it and she could have examined the representations made therein, if she had so chosen. This is not a case where the applicant was misled or confused by the intricacy of the forms or answers to questions which she could not see because they were not before her.

When he was confronted with the same argument on the motion for judgment on the pleadings, Judge Kraft said:

> We do not believe that § 318 or the public policy therein declared precludes the incorporation by reference in a signed application of another existing document when both the signed application and the existing document incorporated therein by reference are both attached to the policy of insurance. *The statute does not require the application to be signed at the end thereof or at any other place; nor does it require that each page thereof be signed; nor does it prescribe any form of application "as signed by the applicant" be contained in or attached to the policy.* That requirement was met here. (Opinion of May 20, 1965, pp. 8–9.) (Emphasis added.)

### CHECK-O-MATIC

■ The plaintiff's third argument is that the request for Check-O-Matic was an application document, and that since it was not attached to the policy when delivered none of the other documents were admissible into evidence. In support of this provision she again relies on § 318, supra. The defendant maintains that the plaintiff is precluded from raising this argument at this time because no reference was made to it in her motion for a directed verdict under Rule 50, F.R.Civ.P. On the merits the defendant denies that the request for a Check-O-Matic was an application document. Since I agree with the defendant's arguments on the merits, I have put to the side its procedural argument on the application of Rule 50.

Despite careful research given to this issue by the parties, Judge Kraft and myself, no case has been found which is closely in point. At the trial I adopted Judge Kraft's holding on this point, and I do so again. At page 4 in his Opinion, supra, Judge Kraft said:

> In our view Exhibit 3 (request for Check-O-Matic) is not in any true sense, a part of the application. Plaintiff did not, by its terms, apply for or, request an insurance contract. She merely requested and authorized a particular mode of premium payment in the event that the policy applied for was issued. We are not persuaded that every request or authorization directed to an insurer, though contemporaneously with an application, necessarily constitutes a part of the application. (Opinion of May 20, 1965, p. 4)

It should be noted that although the application for a Check-O-Matic was not attached to the policy, a "Rider Regarding The Payment of Premiums Under The Check-O-Matic Premium Arrangement" was physically attached to and made part of the policy. The defendant contends, therefore, that the terms of premium payment were before the plaintiff when she signed the application amendment on September 15, 1965. In Good v. Metropolitan Life Insurance Co., 166 Pa.Super. 334, 71 A.2d 805 (1950), *allocatur refused,* the Court held that a "Rider" similarly attached, and more crucial to the policy in question than that

here, complied with the requirements of § 318. There the Court said:

> The general purpose of this Act, and of earlier similar statutory provisions, is to keep before the insured all the terms of his contract with the company. Lenox v. Greenwich Insurance Company of New York, 165 Pa. 575, 577, 30 A. 940. "The insured or beneficiary is entitled to have the whole application before him, if any part of it is to be used against him as a defense": Sandberg v. Metropolitan Life Insurance Company, 342 Pa. 326, 328, 329, 20 A.2d 230, 231. In the present case the entire written application of the insured was attached to the policy. In addition the face of the policy in question contained the following: "This policy is subject to the Special Provision as to Aeronautics included herein." The rider, captioned "Special Provision as to Aeronautics Supplemental Agreement attached to and made a part of Life Insurance Policy No. 13 547 768A issued on the Life of Roy F. Good," was physically attached to the policy as issued on May 16, 1941. Defendant by letter called insured's attention to the fact that the rider was attached to the policy, and recited the clause in full. Insured, on May 17, 1941, acknowledged receipt of the policy, and in writing specifically accepted it as issued with the rider or aeronautics clause included. This acknowledgment was returned to the defendant. The policy was thereafter delivered to insured's father, Robert P. Good, on May 17, 1941. The father paid the premium but did not read the policy in full, and he did not become aware of the special provision as to aeronautics until shortly after insured's death.
>
> Defendant could rely upon the special provision as to aeronautics which was attached to the policy although

insured's written consent thereto was not also attached. (pp. 337–337, 71 A.2d p. 807)

Thus, I conclude that plaintiff's arguments as to the application for Check-O-Matic must be rejected (a) because the Check-O-Matic provision was not part of the application for the policy and need not have been attached, and (b) even if it had been part of said application, a rider was attached and the defendant was entitled to rely on that fact.

## IS THE PLAINTIFF BOUND BY DECEDENT'S FRAUD?

■ Finally, in support of her motion for judgment n. o. v., the plaintiff argues that even if Nathan Ostrov knowingly misrepresented his medical history to the defendant, she, not having signed that section of the application, was not bound by his answers. Essentially, the plaintiff's arguments can be reduced to two points (a) that she could only be bound if she personally signed every document, and (b) even if the documents were incorporated by reference, she did not warrant the truth of her husband's answers and she would be bound only if it were proved that she knew them to be false—which she contends was not so proved.

The defendant contends, on the other hand, that Mrs. Ostrov having signed the application amendment of September 15, 1959 (to which was attached all other application documents) had those answers "before her" and is bound by them. It cites several policy reasons why this result should follow. In my judgment, the defendant's arguments have great merit.

In the previous section of this opinion, I held that § 318 of the Insurance Code does not preclude incorporation by reference, and it is agreed that when Mrs. Ostrov signed the application amendment on September 15, 1959, all the other application documents were attached to the policy.[2] Therefore, the only issue for

2. The following is an excerpt from the notes of testimony of December 3, 1965. (pp. 156–157) :
The Court: Gentlemen, we have an agreement at least not as to what constitutes the contract, but we have an agreement among all the parties that P-7, which I gather is the major printed portion of the policy, included as of the time it was delivered to Mrs. Ostrov, P-6, P-8

decision is whether she can be bound by the statements of her husband even if she did not know that they were false.

Although this question has been extensively researched by counsel and by myself, we have been unable to discover any Pennsylvania cases in point. The problem has been complicated by the fact that the answers were given by the "Life Proposed" and not by the owner of the policy. However, the defendant has cited two cases from other jurisdictions which have shed some light on our problem. They are Bradach v. New York Life Insurance Co., 260 Wis. 451, 51 N.W.2d 13 (1952), and Equitable Life Assurance Society of United States v. New Horizons, Inc., 28 N.J. 307, 146 A.2d 466 (1958).

In the *Bradach* case, the plaintiff and one Paul E. Giese had been partners in a business. In the summer of 1949, each took out a $10,000 policy on the life of the other, issued by the defendant life insurance company. Giese died and the insurance company refused payment on the policy on the ground that he had fraudulently made false statements about his health on which the defendant had relied. Unlike the instant case, Giese, the "Life Proposed" had apparently not signed the statement which contained the answers he had given concerning his health. However, the Court, by implication at least, assumed that if he had,

Bradach, the owner of the policy, would clearly be bound.

It is true that there is no evidence in the record that Giese actually signed either Part I or Part II of the application for the policy. *The crucial issue on this appeal, therefore, is whether the plaintiff is bound by the false answers in Part II of the application in the absence of any proof that the insured Giese ever signed such portion of the application containing these false answers.* (51 N.W.2d 13, at p. 15) (Emphasis added.)

The Court held that the plaintiff was bound by the false statements of his partner. The Court made the following observation which is highly relevant to the issue now before me.

Plaintiff points to the fact that in most life insurance cases which have reached the courts the insured has been the purchaser and owner of the policy, and urges that there are stronger reasons for holding that a policy is invalidated by false statements in the application in those cases than in the instant case where a person other than the purchaser or owner of the policy is the insured. No authority is cited in support of such contention, and sec. 209.06, Stats. makes no distinction between the case where the insured is the purchaser or owner of the policy and where he is not. Each life insur-

---

and P-5. That is our agreement as to that issue. Is that correct, gentlemen?

Mr. Abramson: Yes, sir.

Mr. Leibold: Yes, it is.

The Court: Very well. I will instruct the jury accordingly.

Mr. Leibold: Yes. Will the record note the stipulation indicated in Judge Van Dusen's pretrial report dated September 23, '65?

"P. agrees to the last sentence of Paragraph E of D's pretrial memo."

And I will read that sentence into evidence.

The Court: Very well.

Mr. Leibold: That sentence reads as follows:

"Defendant requests that plaintiff stipulate that Exhibits 2, 4, 5 and 6 to plaintiff's complaint were physically

attached to the Policy No. 241 76691-A when the policy was delivered and became effective on September 15, 1959." So that there may be no confusion we will have to translate that Exhibit 2 was the owner from which is now identified as P-8 in this case; that Exhibit 4 to the complaint is now identified as P-6 and that is the application amendment; that Exhibits 5 and 6 to plaintiff's complaint were two numbers given to Part A and Part B of the application dated August 11 and August 18, 1959.

The Court: You agree to that, Mr. Abramson, do you not?

Mr. Abramson: There is no question about that, Your Honor.

The Court: Very well.

ance company undoubtedly has well-defined rules as to the health requirements of persons it is willing to insure at its standard rates. *If it is by false statements in the medical portion of a policy application induced to insure some one whom it would be barred from insuring under its rules, and such false statements have increased the risk, there would seem to be no logical reason why it should not be permitted to raise such facts as a defense regardless of whether the insured who made the false statements is the purchaser or owner of the policy, or whether such owner is his wife, partner, corporate employer, or third person.* (P. 17) (Emphasis added.)

The plaintiff argues that *Bradach* is distinguishable because Wisconsin has no counterpart to § 318 requiring the applicant's signature to the application document. She asserts also, that the statute under which *Bradach* was decided binds, an insured to statements made not only by himself, but on "his behalf." This she argues runs counter to Pennsylvania as reflected in the *Syme* case, supra. I do not find any of these arguments persuasive.

It is true that Wisconsin does not have a statute equivalent to § 318; however, as I pointed out earlier, the plaintiff's interpretation of that statute is an unreasonable one. The fact remains that she signed the application amendment of September 15th,—an event, which to this Court, is of great significance. Two things are clear: (1) that the plaintiff did "sign" the application, for the purposes of § 318, and (2) that it was within her power to examine her husband's answers; and the fact that she did not do so, does not change the result.

The plaintiff's argument based on *Syme* misconceives the facts of that case. There, after the insured had signed the application, the agent for the insurance company changed the application so that it was not that which he [the insured] had signed. The Court held that there

was no ratification of this change by the insured. It did not hold that there could never be a situation where an insured and/or policy owner could be bound on theories of agency. The Court's opinion was intended to cover the conventional situation where the insured is also the owner. I do not believe that the *Syme* case was intended to preclude an owner from being bound by the statements of the "Life Proposed" where, as here, the applicant has actually signed the application, and the statements are available for her perusal.

The words of the New Jersey Supreme Court in Equitable Life Assurance Society of United States v. New Horizons, Inc., supra, are instructive. There the Court faced with a very similar problem said:

An insurance contract is preeminently one of the utmost good faith. * * * The insurance company customarily relies on the truthfulness of the insured's rendition of his medical history. It is physically and economically impossible for an insurer to give every potential insured an elaborate medical examination which will disclose the less obvious defects in his health. Indeed, it is common knowledge that many insurance policies of certain types and under certain amounts are issued without any prior examination by an insurance company doctor. (146 A.2d p. 469.)

To rule otherwise, on this question, would put an undue burden on insurance companies in cases such as this. The insurance company relies, as it clearly did here, on the truthfulness of the answers given to it. To hold, without more, that where the insured is not the owner of the policy, a different result should follow than in those cases where the insured is the owner, is a result not dictated by sound policy. In situations such as these, where the owner has ratified the representations as to health, he or she should be bound thereby. It is difficult to find credible Mrs. Ostrov's bland

assertion that she was unfamiliar with her husband's bad health—particularly since she worked with him daily in the family business, in addition to their normal husband-wife relationship. Nevertheless, even if one assumes these assertions to be credible, plaintiff requests a ruling which would give carte blanche latitude to the unscrupulous. While I recognize that insurance policies are to be construed strictly against the insurance company, I do not find any rationale within that doctrine to grant the owner of the policy immunity from the fraud of the insured (i. e., the Life Proposed). I find that neither the cases nor the statutes give plaintiff sanctuary where she can be insulated from her husband's fraud even if she was actually unaware of the fraud her husband was perpetrating.

The jury having found that Nathan Ostrov knowingly falsified answers concerning his medical history, and those answers having been incorporated into the application of the plaintiff, I hold that she was bound by them as a matter of law.[3]

Judge Kraft's observations at the conclusion of his opinion, supra, sums up this part of the problem aptly.

\* \* \* If the applicant's signature had been affixed to Ex. 5 and 6, as plaintiff contends is required by § 318, this phase of the controversy might have been avoided, but in our view such signatures would have been only *cumulative* to the applicant's signature on Ex. 2.

We pass now to the arguments made by the plaintiff as to why she is entitled to a new trial.

## II.

## MOTION FOR A NEW TRIAL

### DID THE COURT ERR IN DENYING PLAINTIFF LEAVE TO AMEND?

The first argument raised by the plaintiff in support of her motion for a new trial, is that the trial judge erred in failing to grant her leave to amend the complaint. The plaintiff argues that under Rule 15 of the Federal Rules of Civil Procedure, where no prejudice to the rights of the defendant is shown, she should have been permitted to amend her complaint.

The plaintiff sought to amend her complaint to plead that there had been an additional application amendment executed, presumably by her, on or about September 2, 1959, which had not been attached to the application and policy. The failure to attach this amendment would, of course, preclude any of the application documents from being introduced into evidence.

At the pretrial conference of September 23, 1965, Judge Van Dusen ordered the defendant to submit to the plaintiff all correspondence between Metropolitan's local office and its home office in New York. Among the correspondence submitted was a letter of September 2, 1959, signed by Paul Jimirro, defendant's local manager, and sent to Mr. O'Donoghue of defendant's home office. Allegedly the letter listed four documents as being enclosed, including an amendment application. The plaintiff sought to have Mr. Jimirro's testimony introduced to prove the existence of an executed application amendment. The defendant objected to this on two grounds: (1) that the witness' testimony was ir-

---

**3.** At the end of the application amendment of September 15, 1959, before the signatures of both Mr. and Mrs. Ostrov are appended, is the following statement: This statement was referred to earlier in this opinion but is repeated here for emphasis:

These amendments and declarations are to be considered as a part of the said application and subject to the agreements, covenants, and statements therein contained. The said application, together with these amendments, is to be considered as the basis of and as a part of the contract of insurance. *The said application, as amended, is correct and true, and I hereby ratify and confirm the statements therein made as of the date thereof.* (Emphasis added.)

relevant and immaterial, and (2) that his name was not listed on any pretrial memorandum. Mr. Jimirro was permitted to testify in the absence of the jury, and after consultation at sidebar, his testimony was stricken. Similarly, the plaintiff's request to call Mr. O'Donoghue was denied on the same ground.

There are several things which need to be said about the plaintiff's contentions. First, the plaintiff had ample opportunity to raise this issue earlier and failed to do so.[4] Second, the plaintiff's arguments assume that there was proof that the letter of September 2, 1959, included an executed amendment application; however, there was no proof of that from Mr. Jimirro's testimony. Third, and by far the most fundamental, there were steps which the plaintiff could have taken to prove the existence of this amended application had she chosen to do so. Mrs. Ostrov could have been questioned during her testimony as to whether or not she had signed any additional application document which had not been appended to the policy. Had she replied in the affirmative an additional issue of fact would have been created which the jury would have had to resolve. As an alternative or complementary measure counsel for the plaintiff could have asked Mr. Varacallo, who was a witness to the signing of the Owner Form and Application Amendment, if any other document had been signed by either or both the Ostrovs at that time. This would have been rele-

vant for Mr. Jimirro had testified that Mr. Varacallo would have witnessed the signature on any executed application amendment. Of course, these witnesses would have to have been called on rebuttal, but this plaintiff had a perfect right to do.

The standard for testing the correctness of the denial of plaintiff's motion to amend, is whether there was an abuse of discretion on my part in doing so. See Clark v. Pennsylvania Railroad Company, 328 F.2d 591 (2d Cir. 1964) and McDowall v. Orr Felt & Blanket Co., 146 F.2d 136 (6 Cir. 1944). If what has been said above is accurate, then it is clear that it was unnecessary for plaintiff to amend her complaint in order to seek proof of an additional executed application amendment. Thus, her first ground for a new trial must be rejected.

### FRAUD

The plaintiff next contends that the Court erred in failing to submit to the jury a correct interrogatory on the question of fraud, and in failing to charge correctly on the defendant's burden of proof on that issue. To the extent that the plaintiff's arguments reiterate her arguments—dealt with in part one—that she was not bound by her husband's statements, I reject them without further discussion.

Interrogatory No. 1, submitted to the jury, reads as follows:

As to any material question in the application pertaining to his present

---

4. What follows below is an excerpt from the notes of testimony of December 2, 1965, pp. 38–39:

Mr. Abramson: Therefore, Your Honor— Your Honor, therefore, in accordance with Rule 15 of the rules of this court I would like to amend my complaint to add thereto that the applicant for this policy had signed an amendment to her application which amendment was Form 0843–42, and this amendment was signed prior to the issuance of the policy in suit, which was September 15, 1959.

I make that motion to amend in accordance with Rule 15, and may I take the presumption to show you this rule.

The Court: I am familiar with the rule. Mr. Leibold, do you object to the amendment?

Mr. Leibold: I object to the amendment, Your Honor, at this stage of the case or any other. I don't know what the meaning of the world "applicant" is. If Mr. Abramson means Mrs. Ostrov, then I would believe that she would have been aware sometime prior to today that she signed it.

The Court: I am going to sustain the objection to the amendment.

Gentlemen, this case has been pretried and it was post-pretried before me as recently as Friday, and none of these matters came up.

health condition and to any prior health condition and to any prior laboratory, hospital and medical treatment and consultation, did Nathan Ostrov know at the time he answered such questions that any of the answers were false?

The plaintiff argues that this interrogatory was in error because under the law of Pennsylvania the jury must find that the insured "practiced a deception * * with deliberate intent to deceive." In support of this argument the plaintiff cites Ciesielski v. Prudential Insurance Co., 416 Pa. 146, 205 A.2d 42 (1964). I have read that case with care, and, in my judgment, plaintiff has grossly misinterpreted its holding. There is no suggestion in Justice Musmanno's opinion that the defendant must prove anything other than knowledge on the part of the plaintiff that a material statement is false.[5]

The language of the interrogatory was based on three cases which, in my best judgment, accurately reflect Pennsylvania law on this subject. The cases are: Evans v. Penn Mutual Life Insurance Co., 322 Pa. 547, 186 A. 133 (1936); Stopper v. Manhattan Life Insurance Co. of New York, 241 F.2d 465 (3 Cir)., cert. denied, 355 U.S. 815, 78 S.Ct. 17, 2 L.Ed.2d 32 (1957); and Shafer v. John Hancock Mutual Life Insurance Co., 410 Pa. 394, 189 A.2d 234 (1963). The law was most accurately stated in the *Stopper* case where the Court said:

> * * * the knowledge of the insured that he is making a false statement itself establishes the bad faith on the basis of which a verdict must be directed. This is such a case, since the documents in evidence make it clear that the insured must have known that he was withholding the more recent and significant part of the information requested concerning

medical consultations and treatment * * * (241 F.2d at p. 468.)

We come now to plaintiff's contentions on the question of burden of proof. At trial, the jury was instructed that on the issue of fraud the defendant had the burden of proof by a preponderance of the evidence; this, the plaintiff claims was error. Instead, she contends that it was the defendant's burden to prove fraud by "the preponderance of 'clear and satisfactory evidence.'" I do not think that the instruction was error. It is implicit, it appears to me, in the phrase "preponderance of the evidence" that such evidence be "clear and satisfactory." That phrase adds nothing to the defendant's burden and is a mere semantic embellishment.

The defendant argues, and I agree, that the plaintiff has cited no insurance case which holds that the insurance company, in an action such as this, has any greater burden of proof. The applicable standard, I think, was set forth in Smith v. State Mutual Benefit Society, 164 Pa. Super. 207, 63 A.2d 488 (1949), where the Court observed:

> " * * * The insurer has 'the burden of showing, by a preponderance of the evidence, not merely the fact of unsound health at the date [of issuance] * * * but also that the applicant knew her health was unsound, and fraudulently concealed that knowledge from the company.'" (at p. 209, 63 A. 2d at p. 488.)

## MEDICAL RECORDS AND TESTIMONY

The plaintiff's next contention is that the admission into evidence of certain medical records was error. At trial, over the plaintiff's objections, certain letters and reports of Dr. Lawrence Beizer, medical records of Nathan Ostrov at Graduate Hospital, and reports of x-rays and other tests were admitted. The plaintiff

---

5. The reporter's headnote to Ciesielski, though not official, is instructive. It reads:

In order to avoid a life insurance policy on the ground of alleged fraudulent representations, the insurer must show, not only that the statements were false, but that the insured knew they were false or otherwise acted in bad faith in making them.

argues that they should not have been since she did not have an opportunity to cross-examine the authors of those reports and the persons who made the x-rays and tests. The plaintiff contends, also, that it was error to permit Dr. Siegel to testify as to his diagnosis of Nathan Ostrov's illness, since that diagnosis was based on opinions and diagnosis contained in letters and reports sent to him by Dr. Beizer. The plaintiff points out that she did not have an opportunity to cross-examine Dr. Beizer, For purposes of clarity, it is essential that the documents and testimony be specifically identified in order to understand the scope of my ruling.

The Court permitted Miss Theresa Acchione, the assistant medical record librarian of the University of Pennsylvania Graduate Hospital, and Miss Catherine Cerullo, the medical secretary of Dr. Beizer, to testify within certain limitations about the records of their respective employers. In addition, Dr. Siegel, who treated the decedent from 1957 to 1961, was permitted to testify, with the aid of his records, as to his treatment of the deceased from 1957 to September 15, 1959—the date when the policy became effective. During this time, in order to properly treat and diagnose Nathan Ostrov's condition, Dr. Siegel ordered a series of tests and x-rays which were performed at Germantown Hospital and the Langer Laboratories. These included barium, kidney, skull and sternum x-rays. Dr. Siegel sent Mr. Ostrov to Dr. Beizer, a hematologist, who was a specialist in the type of disorder from which decedent suffered. Dr. Siegel received various reports from Dr. Beizer. At the trial when plaintiff's counsel objected to Dr. Siegel's references to an x-ray study which he had ordered performed at Germantown Hospital, I overruled his objection and stated: "But, so it will be clear, I will permit any doctor to testify as to the records which he got as a result of examinations, x-rays, blood tests which he ordered and relied on in rendering his diagnosis." (N.T., p. 69); (see also

N.T., pp. 70, 71.) As to the report which Dr. Siegel had received from Dr. Beizer, I permitted Dr. Siegel to testify only that he had received reports from Dr. Beizer dated August 4, 12, 27 and September 29, of 1957. I did not permit Dr. Siegel to read to the jury Dr. Beizer's letter to Dr. Siegel. However, subsequent to Dr. Siegel's testimony, Dr. Beizer's medical secretary testified and identified Dr. Beizer's records and with that identification of the letters, from Dr. Beizer to Dr. Siegel, I permitted that letter, along with Dr. Beizer's other laboratory reports, blood tests, etc., to be submitted to the jury.

The records, tests, x-rays and letters were admitted into evidence pursuant to the provisions of the Federal Business Records Act, 28 U.S.C. § 1732.

Within the last year, the United States Court of Appeals in this Circuit has placed its imprimatur on the broad scope of admissibility left to the discretion of the trial judge, where the matter is material and relevant. In Woods v. National Life & Accident Insurance Co., 347 F.2d 760 (3 Cir. 1965) there was in the V. A. file additional evidence in the form of x-ray films and reports gathered from *several health centers* * * * the file contained about a dozen reports of x-rays taken between June 1960 and January 1962 by two hospitals, *several public health clinics* and the V. A. Also in the file *were numerous letters* and memoranda, rating reports and applications for dependency and indemnity compensation, or death pensions by widow and child, dated October 19, 1962 and signed by Odessa J. Woods, which were denied in the Army Medical Service record of M. F. Woods. As to the totality of these documents, the court held that "[t]he file was properly shown to have been part of the VA records. Such records are business records within the meaning of 28 U.S.C.A. § 1732. Brooks v. Texas General Indem. Co., 251 F.2d 15 (C.A.5, 1958); Kendall v. Gore Properties, Inc., 98 U.S.App.D.C. 378, 236 F.2d 673, 684 (C.A., D.C.1956)." The Court then noted that "[o]f course the mere

fact that the documents were a part of the VA file did not make them admissible per se; they must be *relevant and material* to the issue at the trial". Continental Baking Co. v. United States, 281 F.2d 137, 148–149 (C.A.6, 1960)." (Emphasis added.) "[E]ven if they [met the tests of relevance and materiality] the trial court, in its sound *discretion,* may exclude them if they are merely cumulative."

Thus, the *Woods* case establishes that there can be records which are considered to be part of the V.A. business records even though the record did not originate within the V. A. As an example, in *Woods,* supra, the records from "several public health clinics" were obviously not originally V. A. records. The only caveat placed by the Court of Appeals was whether the documents were "relevant and material to the issue at the trial." It is inconceivable that there could be more relevant documents which establish the patent falseness of Nathan Ostrov's answers. These records used and relied on by Dr. Siegel demonstrate that Ostrov had had those tests and further that the tests had been ordered by Dr. Siegel as an aid in making his diagnosis. To the extent that the instant matter is one within the discretion of the trial court, if Mr. Ostrov's actual medical condition or diagnosis had been of decisive significance, I might have considered a more rigorous ruling requiring the presence of the keeper of records at the laboratories or hospital which performed these tests. However, in the instant case, the gravaman was his false answers, rather than what would have been a more difficult question of fact,—the interpretation of these test results. Furthermore, I carefully confined the admissibility of these reports to those reports which Dr. Siegel or the consulting specialist had personally ordered.

 The recent decision of the Court of Appeals for the Third Circuit in United States v. 60.14 Acres Of Land, 362 F.2d 660 (3 Cir. 1966) reflects the trend towards a liberal rule of admissibility

of evidence. In that case Judge Freedman, writing for the Court, said:

\* \* \* the federal decisions have come increasingly to reflect the modern rule that all relevant and material evidence is admissible unless there is a sound, practical reason for barring it. Thus, it has been said that the courts will assume that a well-established federal rule of evidence at law was also applied on the equity side even though no equity decision so declared, because this would accord with the maxim that equity follows the law and also "with just ordinary good sense." Carlson v. Chisholm-Moore Hoist Corporation, 281 F.2d 766, 771–772 (2 Cir. 1960), cert. denied, 364 U.S. 883, 81 S.Ct. 172, 5 L.Ed.2d 104. *So also evidence was admitted because it was necessary and trustworthy, under a court-created exception to, the hearsay rule even though it was not a "business record" or "an ancient document", or "any other readily identifiable and happily tagged species of hearsay exception."* Dallas County v. Commercial Union Assurance Co., 286 F.2d 388, 398 (5 Cir. 1961). And we recently held that a guilty plea to a charge of reckless driving was admissible in a civil suit despite a state statute forbidding it. Rain v. Pavkov, 357 F.2d 506 (3 Cir. 1966). Nor is the rule any different because the question involves the scope of an exception to an exclusionary rule rather than the exclusionary rule itself. (p. 666) (Emphasis added.)

In addition to the general attack on the admissibility of the records ordered or relied on, by Dr. Siegel, and those tests ordered by Dr. Beizer, plaintiff makes a frontal attack on the admissibility of any document of a hospital record where the sole person testifying in behalf of that record was the medical record librarian. This type of challenge has been unanimously repudiated by the federal courts.

 The records were identified properly by their custodians and the fact that they had no personal knowledge

of their contents did not affect their admissibility, although possibly their weight. In Thomas v. Hogan, 308 F.2d 355 (4 Cir. 1962), the Court of Appeals for the Fourth Circuit held admissible a record similar to the ones questioned here. The Court held that a hospital record entry, to be admissible, need not state the qualifications of the diagnostician or technician. The Act, it held, supplies a presumption that the diagnosis and tests were properly made by qualified personnel, where [as in the instant case] the recorded information reflected the usual practice and routine of the hospital.

The fact that the plaintiff was unable to cross-examine the makers of the records, does not change the result. The question in this case was not whether the records and tests were accurate, but whether Nathan Ostrov falsified his answers, thereby preventing the defendant from being put on notice as to the state of his health.

■ We must bear in mind the issue presented in this case. Unlike Masterson v. Pennsylvania Railroad Co., 182 F.2d 793 (3 Cir. 1950), a case relied on by the plaintiff, we are not concerned with the cause of Nathan Ostrov's death, but the question of whether he had or had not consulted a physician. Thus, it becomes less relevant that Dr. Siegel may have relied on Dr. Beizer's opinions in making his own diagnosis. I have found no cases precisely in line with the issue before us. However, there are several cases which point the way. In White v. Zutell, 263 F.2d 613 (2 Cir. 1959) the Court admitted a physician's report even though it was based in part on x-rays made by another doctor, which were not introduced into evidence. This would seem to make the instant case stronger since Dr. Beizer's reports and letters were introduced into evidence. Of a similar nature is Moran v. Pittsburgh-Des Moines Steel Co., 183 F.2d 467 (3 Cir. 1950), where a report of the Bureau of Mines was admitted into evidence although it was in part based on the conclusions of experts who were not made available for cross-examination.

■ The letters of Dr. Beizer, it is true, were not originals but extracts of reports. However, it is not unusual, but far to the contrary, for doctors to send to a colleague extracts of reports where they are both treating the same patient. This was the case here. Dr. Beizer's reports were made in the course of his practice and his letters were based on those reports; they were written in the course of his normal practice and therefore were admissible. Compare United States v. Manton, 107 F.2d 834 (2 Cir. 1938) cert. denied 309 U.S. 664, 60 S.Ct. 590, 84 L.Ed. 1012.

The plaintiff's objections on these last two points are also overruled.

## LEGIBILITY

■ The plaintiff has taken several exceptions to the charge given to the jury on the question of the legibility of the application documents. The jury found that the documents signed by Mrs. Ostrov, and the application amendments were legible. Since that question was mine to decide, as a matter of law, the jury's decision was, in legal effect, superfluous.

Section 318 of the Insurance Code requires that a "correct" copy of the application documents be attached to the policy. The plaintiff contended that if a copy is to be "correct", it must be legible. With this argument I agreed. Therefore, the following interrogatory was submitted to the jury:

Is the copy of the applications signed by Nathan B. Ostrov on August 11 and August 18, 1959, which the Metropolitan Life Insurance Company attached to the policy a legible copy of the original applications?

The jury answered that interrogatory in the affirmative. No Pennsylvania cases have been found construing § 318 on this point. There are, however, several Third Circuit cases on this question. They are: Arter v. Northwestern Mutual Life Insurance Co., 130 F. 768 (3 Cir. 1904);

New York Life Insurance Co. v. Halpern, 57 F.2d 200 (W.D.Pa.1931), aff'd. per curiam, 61 F.2d 1037 (3 Cir. 1932); Adamos v. New York Life Insurance Co., 5 F.Supp. 1019 (W.D.Pa.1934), aff'd. 71 F.2d 997 (3 Cir. 1934), reversed on other grounds, 293 U.S. 386, 55 S. Ct. 315, 79 L.Ed. 444 (1935); Enelow v. New York Life Insurance Co., 83 F.2d 550, 105 A.L.R. 493 (3 Cir.) cert. denied, 298 U.S. 680, 56 S.Ct. 948, 80 L.Ed. 1401 (1936).

In the *Arter* case the trial judge's failure to submit the question of legibility to the jury was challenged. The Court held that:

> * * * [T]he real subject of complaint is, not that the copy is not a correct one, but that it is not legible, and it has been not unreasonably urged that in fairness to the insured the original should not have been so greatly reduced in the reproduction. But the learned trial judge appears to have experienced no difficulty in reading it, and, although it has become somewhat blurred—probably since the trial— we, too, have been able to read it. Under these circumstances there was nothing to be left to the jury. The photographic print was certainly "correct," and, in the absence of any specific designation or description in the statute, we know of no more apt test by which to determine whether it should be regarded as a "copy" than that supplied by Stephen * * * in defining the word "document," which, he says, "means any substance having any matter expressed or described upon it by marks capable of being read." (130 F. at p. 769.)

In *Adamos*, where the contention of illegibility was also raised, the Court held that:

> * * * we cannot find that the copy of the application is so illegible as to fail of compliance with the Pennsylvania statute. We have had no trouble in reading it, and do not think the applicant would. The application and the insurance policies, with the copy of the application, were offered in evidence on the trial of the equitable issue, without objection on the part of the plaintiff. (5 F.Supp. at p. 1020).

In the *Enelow* case the Court of Appeals made this observation in ruling on the legibility issue:

> * * * the trial judge, in denying the motion for a new trial, said: "The policy was offered in evidence. I have been able to read what is set forth in this application without any particular difficulty except as to a few words therein. The questions and the answers, which are the subject of the defense, were read by me with very little, if any, difficulty, and without the use of magnifying glasses." (83 F.2d at p. 552).

I conclude, therefore, that if the trial judge could read the policies with normal ease—which I could—the question could have been rightfully withheld from the jury. The plaintiff, however, objects to the following portion of my charge:

> What is this standard of legibility? A true copy of the original must be a legible copy such as a person with undefective eyes and normal vision could discern the writing upon and could read with a fair degree of certainty. It is for this reason that I read all of this to you from Part A without glasses.

The plaintiff contends that it was "unfair" of me to tell the jury that I was reading the application amendment without my glasses. It is the prerogative of a Federal Trial Judge to comment on the evidence, however, the jury was reminded, on several occasions during the charge, that it was the sole judge of the facts.

> It will be for you and for you alone to be the sole determiners as to what you believe are the true, accurate and correct facts of this case. Thus it will be on your recollection. Accordingly, if in the process of my discussing this matter with you I make reference to any facts which you will not recall, then you are obligated to disregard it,

or if I state a fact differently than you recall it you should rely on your own recollection * * * (N.T., p. 237.)

The jury was cautioned also, that it was its province alone to decide the facts. However, even if it is argued that my comment was a "binding instruction" to the jury, this was my right to do, and there was no error.

The issue was submitted to the jury as a precautionary measure. The jury having found for the defendant, the plaintiff has no grounds to complain. If these observations are accurate, then it follows that plaintiff's other objections—namely, my refusal to permit an expert to testify on legibility, and my refusal to call to the jury's attention specific portions of the application documents—are totally lacking in merit.

## POST-ISSUANCE HOSPITAL RECORDS

The plaintiff argues that a special interrogatory should have been submitted to the jury on the question of whether the Check-O-Matic request was an application document. In light of the rulings of Judge Kraft and myself that it was not; there was no reason to submit such an interrogatory; and I reject plaintiff's arguments without further discussion.

 Finally, the plaintiff objects to my ruling that the Graduate Hospital record of Nathan Ostrov was admissible. At the outset it should be clear that this record was admitted only insofar as it pertained to Mr. Ostrov's condition prior to the issuance of the policy. The fact that the records post-date the issuance of that policy did not call for their exclusion. The records related to Dr. Beizer's observations on Mr. Ostrov's prior medical history—prior, that is, to September 15, 1959—and as such were relevant to the truthfulness of his answers in the medical questionnaires. Their admission was justified by the Federal Business Records Act.

Since all reference in the records to Nathan Ostrov's subsequent history was excluded, I find that no error was committed in this regard. The plaintiff's motion for a new trial is therefore overruled.

Finally, I would like to make note of Rule 61 of the Federal Rules of Civil Procedure which reads:

No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict or for vacating, modifying, or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceedings must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.

One will search the reported insurance cases in vain to find fraud which has been more flagrant than that committed by Nathan Ostrov. Indeed, there are some facts of record, such as the manner in which the ownership of the insurance policy was changed from Nathan Ostrov to the wife, which raise an inference that the whole process of attempted deception against Metropolitan was most carefully planned, though by this opinion and the jury's verdict, not successfully consummated.

In this opinion, I find that none of the contentions made by the plaintiff demonstrate errors which warrant a new trial. The evidence adduced clearly supported the defendant's allegations of fraud. The parties received substantial justice and the plaintiff's motion for a new trial is denied.