### RITTER v. MUTUAL LIFE INS. CO. OF NEW YORK.

(Circuit Court, E. D. Pennsylvania. April 4, 1895.)

1. LIFE INSURANCE—SUICIDE—INSANITY.
    If one whose life is insured kills himself when his reasoning faculties are so far impaired by insanity that he is unable to understand the moral character of his act, even if he does understand its physical nature, consequences, and effect, his self-destruction will not, of itself, prevent a recovery on the policy. But by capacity to understand the "moral character of his act" is to be understood a capacity to understand what he was doing, and the consequences thereof to himself, his character, his family, and others, and to comprehend the wrongfulness of the act, as a sane man would.

2. SAME.
    The contract of life insurance contains an implied condition that the insured will not intentionally terminate his own life.

3. SAME—PRESUMPTION OF SANITY.
    The presumption of sanity is not overthrown by the act of committing suicide. Suicide may be used as evidence of insanity, but, of itself, is insufficient to establish it, and the burden of proof is still on the party alleging it.

This was an action by A. Howard Ritter, executor of the estate of William M. Runk, deceased, to recover upon policies of life insurance. The deceased carried policies aggregating $75,000, and the defense to the action was suicide.

Barnes, Wintersteen & Bispham, for plaintiff.
John G. Johnson and Chas. P. Sherman, for defendant.

BUTLER, District Judge (charging jury, orally). This case, as it has been said to you, is one of great importance; one which deserves your careful attention, which can only be decided justly by understanding the law that governs it and adhering strictly to the evidence.

As frequently occurs, a good deal of testimony has been heard and several questions raised that will be found in the view the court now takes of the case, to be entirely unimportant. I only regret that we could not know at the outset how the case would present

itself to our mind at the close that we might have avoided the unnecessary expenditure of time, and unnecessary taxing of your strength and patience, and devoted ourselves to what turns out to be the consideration upon which the case must be decided.

The counsel for plaintiff have presented to the court several points on which we are asked to charge, for the purpose of getting their view of the law before you. The plaintiff's first, second and third points are disaffirmed. The fourth is also disaffirmed for the reasons given in answering the defendant's first point, of which I will speak directly.

The fifth point reads as follows:

"If one whose life is insured intentionally kills himself when his reasoning faculties are so far impaired by insanity that he is unable to understand the moral character of his act, even if he does understand its physical nature, consequence, and effect, such self-destruction will not of itself prevent recovery upon the policies."

This is affirmed.

I will say, however, that we must understand what is meant and intended by the term "moral character of his act." It is a term which has been used by courts, and it is correctly inserted in the point; but it is a term that might be misunderstood. We are not to enter the domain of metaphysics in determining what constitutes insanity, so far as the subject is involved in this case. If Mr. Runk understood what he was doing, and the consequences of his act or acts, to himself as well as to others; in other words if he understood as a man of sound mind would, the consequences to follow from his contemplated suicide, to himself, his character, his family and others, and was able to comprehend the wrongfulness of what he was about to do as a sane man would, then he is to be regarded by you as sane. Otherwise he is not.

The defendant's first point reads as follows:

"There can be no recovery by the estate of the dead man of the amount of policies of insurance upon his life, if he takes his own life designedly, whilst of sound mind."

This point is affirmed. The defendant's first point which I have just read to you and affirmed, and the plaintiff's fourth point which I have disaffirmed, raise the same question and it is one of very great difficulty. It is very remarkable that the question has never been directly passed upon by any court of last resort, nor so far as has been discovered, by any other, in this country or in England. When the points were presented I said in your presence that in the absence of authority, or of custom on the part of insurance companies, or the business of insuring, bearing on the subject, I would feel little hesitation in holding that suicide by the insured, while in a sane condition of mind, constitutes a defense to the payment of the policy, but that I was inclined to believe there is authority to the contrary.

It is conceded, however, that there is nothing to be found on the subject but dicta; and this is conflicting, and there is no evidence before the court of any custom in the business of insurance bearing on the subject.

I regret that I must pass on the question without opportunity for examination or reflection. It seems to me, however, that every contract of life insurance contains an implied condition that the insured will not intentionally terminate his life, but that the insurer shall have the benefit of the chances of its continuance until terminated in the natural, ordinary course of events. It is upon these chances that the premium is calculated and based, and the contract is founded. It cannot be doubted that if one having a policy on his buildings, insuring against fire, should intentionally burn them, his act would be a defense to the policy; nor that one taking a policy on the life of his debtor, whom he subsequently murders, cannot recover the insurance. In principle I am unable to distinguish these cases from that where the insured commits suicide.

The fraud upon the insurer seems to me to be as clear in the latter case as in either of the others.

A different construction of the policy would seem to make it a contract to pay the insurance immediately if the insured commits suicide; thus offering an inducement to commit this act. If the insured lives out the ordinary term of life, the time of payment may be very remote, and therefore the inducement to commit suicide is very great if payment follows this event. Of course no insurer would intentionally enter into such a contract; it would be destruction of his interest. His premiums are calculated, and his prospect of gain based, on the insured's chances of life under ordinary circumstances; and if the latter may render the insurance payable immediately by committing suicide, the former is completely at his mercy. If, however, an insurer should enter into such a contract, the law would declare it void, because of its violation of public policy. It would seem, in effect, to be a contract to pay money for the commission of suicide.

If suicide results from insanity, it is not, in legal contemplation, the intentional act of the insured.

What constitutes insanity, in the sense in which we are using the term, has been described to you, and need not be repeated. If this man understood the consequences and effect of what he was doing or contemplating, to himself and to others; if he understood the wrongfulness of it, as a sane man would, then he was sane, so far as we have occasion to consider the subject, otherwise he was not. Here the insured committed suicide, and, as the evidence shows, did it for the purpose as expressed in his communication to the executor of his will, as well as in letters written to his aunt and his partner, for the purpose of enabling the executor to recover on the policy, and use the money to pay his obligations.

I, therefore, charge you that, if he was in a sane condition of mind at the time, as I have described, able to understand the moral character and consequences of his act, his suicide is a defense to this suit.

The only question, therefore, for consideration is this question of sanity. There is nothing else in the case. That he committed suicide, and committed it with a view to the collection of this money from the insurance companies and having it applied to the payment

of his own obligations, is not controverted and not controvertible. It is shown by his declarations, possibly not verbal, but written.

The only question, therefore, is whether or not he was in a sane condition of mind, or whether his mind was so impaired that he would not, as I have described, properly comprehend and understand the character of the act he was about to commit.

. In the absence of evidence on the subject, he must be presumed to have been sane. The presumption of sanity is not overthrown by the act of committing suicide. Suicide may be used as evidence of insanity, but, standing alone it is insufficient to establish it. It is sometimes thoughtlessly said—if a man commits a high crime or takes his life, he was insane, was crazy. The fact that the man commits a high crime is not evidence of insanity, and the fact that he takes his life does not of itself overthrow the presumption of sanity.

There must be something more than this. Therefore, we start with the presumption of sanity in the defendant's favor, and the burden of showing insanity on the plaintiff.

You have heard the evidence on the subject and the comments of counsel respecting it, and from this you must determine how the question should be decided.

I believe the wife and sister alone expressed an opinion that his mind was "unbalanced;" whether either of them formed this opinion before his death I am uncertain. The wife said she did not. If the opinion is based on the fact alone that he committed suicide it is of no value. If it is based on this fact, and his previous conduct, condition or conversation, it may and should be considered; its value still is for you. These witnesses, together with two or three others, and probably more, you will remember, testified to his conversation, his conduct, his nervousness, the change in his appearance, etc., shortly before his death.

You must judge in how far this testimony tends to show an insane condition of mind such as I have described. Might or might not the natural worry and distress occasioned by his unfortunate circumstances and the contemplation of self-destruction as a means of relief, account for his conduct and appearance, without the existence of such insanity?

On the other hand, the defendant has called your attention, on this subject, to the fact that he conducted the business of his firm during his partner's absence and up to within a very short time of his death. You have seen how methodically he prepared for his end,—the letters he wrote, the instructions prepared for his executor, etc. Now, from all the evidence on the subject, and your attention has been very fully called to this by counsel, and there need be no repetition of it, you must determine the question of sanity.

While I thus submit the question, and remind you that the responsibility of deciding it rests upon you alone, I consider it a duty to say that I do not regard the evidence on which the plaintiff relies as strong. It may be sufficient; that is a question entirely for you.

If you find him to have been insane, as I have described, your

verdict will be for the plaintiff. Otherwise, it will be for the defendant. There is nothing more I need say. I can render you no further assistance.

I will repeat, however, that you must be very careful to guard your mind against the influence of sympathy or prejudice.

Each of the parties is entitled to equal consideration at your hands. If you are not guided and controlled by the law as stated by the court, and the evidence as heard here, you will do great wrong to the parties and wrong to yourselves.