**Bernard LOTMAN and Charles Lotman**

**v.**

**SECURITY MUTUAL LIFE INSURANCE COMPANY OF NEW YORK.**

**Civ. A. No. 69–129.**

United States District Court,
E. D. Pennsylvania.
Sept. 23, 1971.

David F. Binder, Philadelphia, Pa., for plaintiff.

Edward W. Madeira, Jr., Philadelphia, Pa., for defendant.

## OPINION AND ORDER

MASTERSON, District Judge.

Plaintiffs, co-beneficiaries of a life insurance policy issued by the defendant, Security Mutual Life Insurance Company of New York, on the life of their mother, Mrs. Minnie Glazer, brought an action for the proceeds after defendant denied the claim.[1] Security Mutual refused payment on two bases (1) that the decedent had made fraudulent misrepresentations which were relied upon by the defendant in issuing the policy, and (2) that the decedent had committed suicide, an event for which the policy expressly denied coverage. Before trial, defendant also asserted that by accepting a refund of premiums, plaintiffs had agreed to a mutual recision of the policy. The two questions of fraudulent misrepresentations and suicide were submitted to the jury which returned a verdict for the plaintiffs. Since the issue of mutual recision involves essentially a question of law, it was agreed that, if necessary, the court would decide that point based on the depositions, without a jury, after the trial.

Following the adverse jury verdict, defendant now moves for judgment n. o. v. and alternatively a new trial on three theories. First, defendant asserts that the court erred in its instructions to the jury on the issue of the misrepresentations made by Mrs. Glazer concerning her prior health. Secondly, defendant claims that the evidence established as a matter of law that Minnie Glazer

---

1. Bernard and Charles Lotman, the plaintiffs, were Mrs. Glazer's sons by her first marriage. Mrs. Glazer was married to her third husband at this time.

committed suicide. Finally, defendant raises the defense of mutual recision. After careful consideration, we have determined that defendant's motion for judgment n. o. v. and a new trial must be denied. A recitation of the facts in some detail is essential to bring the various issues into focus.

In the spring of 1966, defendant's insurance agent, Robert Fainblatt, was looking for clients to whom he could sell life insurance policies and asked his friend, Charles Lotman, to approach his mother, the decedent, and ask if she had any interest in purchasing a policy. Charles Lotman arranged a meeting at his mother's apartment, and as a result, Mrs. Glazer made application for a $25,-000.00 policy with the defendant.

On April 2, 1966, Mrs. Glazer was visited at her apartment by Dr. Kerman Snyder, an examining physician hired by the defendant. Dr. Snyder filled out. a medical form, which was then signed by Mrs. Glazer. It contained many inaccuracies, including misinformation concerning Mrs. Glazer's prior history of mental illness, misstatements concerning the birth dates of both of her two sons, and misstatements concerning the number of sisters which she had alive.

On May 10, 1966, defendant issued the insurance policy on the life of Mrs. Glazer. The plaintiffs, Bernard and Charles Lotman were named as co-beneficiaries.

On May 31, 1966, Mrs. Glazer was admitted to the Institute of the Pennsylvania Hospital, a psychiatric institution, where she remained until June 27, 1966, a period of approximately four weeks. The diagnosis made on discharge was manic-depressive reaction, depressed type, and acute brain syndrome, probably due to barbiturate intoxication.

Dr. Philip Milstein, who was then the resident physician in charge of Mrs. Glazer stated that on admission she was confused, evasive and vague in her replies and was an unreliable historian. It was found that she had been suffering from a psychosis since 1954 when her first husband died. Moreover, the manic-depressive psychosis was chronic and of a recurrent nature.

A mental status examination administered by Dr. Milstein showed that Mrs. Glazer exhibited impairment of both recent and remote memory, in addition to impairment of her attention, concentration and judgment. Dr. Milstein was of the opinion that since March of 1965, Mrs. Glazer had suffered some impairment in her functioning on a daily basis and that it may have been worse on some days than others.

While at the institution it was also learned that Mrs. Glazer was a chronic user of barbiturates (sleeping pills). She had a grand-mal seizure shortly after her admission, and Dr. Robert Jones, the associate medical director at the Institute, stated that the seizure was the result of withdrawal from a large amount of barbiturates which she had been taking for some time. Dr. Jones confirmed Dr. Milstein's testimony that Mrs. Glazer was an unreliable historian due to her psychosis and the use of barbiturates.

On April 11, 1967, approximately a year after she made application for the insurance policy, Mrs. Glazer died. The cause of her death was barbiturate poisoning. Shortly thereafter, Bernard Lotman and Abraham Glazer (the decedent's husband) qualified as co-administrators of her estate.

A claim was submitted by plaintiffs, Bernard Lotman and Charles Lotman, as beneficiaries of the life insurance policy, but defendant rejected it on the ground that Mrs. Glazer had committed suicide and made certain misrepresentations in her medical form. The policy provided in part that:

> "If the death of the Insured shall result from suicide within two years from the Issue Date, the liability of the Company under this policy shall be limited to the amount of premiums paid. * * * "

Defendant subsequently decided to rescind the policy by means of a check in

the amount of $1,483.50, the premiums paid under the policy, payable to the estate of Minnie Glazer. Apparently, the check was first delivered to Charles Lotman who turned it over to his brother. Bernard held onto the check for almost two years without cashing it, and then sent it back to Security Mutual and requested a new one because the old check had become stale. Accordingly, another check in the same amount was sent to Bernard Lotman. He endorsed this check —"Estate of Minnie Glazer, Deceased, Bernard Lotman, Administrator C.T.A." —and deposited it in a joint bank account which he maintained with his brother Charles, who was not an administrator of the estate.

## I. FRAUDULENT MISREPRE-SENTATIONS

Under Pennsylvania law, an insured's statements in an application for life insurance will extinguish liability for the proceeds of the policy if the insurer can show: "(1) the statements by the applicant-insured were false; (2) their subject matter was material to the risk; and (3) the applicant-insured must have known them to be false and made them in bad faith." Lynch v. Metropolitan L. Ins. Co., 427 Pa. 418, 424, 235 A.2d 406, 409 (1967). See also, Allstate Insurance Co. v. Stinger, 400 Pa. 533, 163 A.2d 74 (1960).

At trial, there was no dispute that when she executed the application for insurance on April 2, 1966, Mrs. Glazer made false and material misrepresentations as to her physical and mental history. Nor was there any dispute that had defendant been fully advised as to her history, no policy would have been issued. But the issue of Mrs. Glazer's knowledge of the falsity of the statements and her bad faith was vigorously contested. In connection with this issue, defendant raises two complaints.

First, Security Mutual asserts that the court erred in charging that the defendant had the burden to persuade the jury that these misstatements were made "in bad faith for the purpose of deceiving the insurance company." (Charge at p. 6). Specifically it is argued that an instruction requiring an insurance company to show an intent to deceive was improper under Pennsylvania law. Defendant relies upon Ostrov v. Metropolitan Life Insurance Company, 260 F.Supp. 152 (E.D.Pa.1966), where the court stated that in order to prevail on the ground of fraudulent misrepresentation, the insurer need not show that the insured " 'practiced a deception * * with deliberate intent to deceive.' " Id. at 165. The court further indicated that Pennsylvania law was in accord with that stated in Stopper v. Manhattan Life Insurance Co. of New York, 241 F.2d 465 (3rd Cir. 1957), cert. denied, 355 U.S. 815, 78 S.Ct. 17, 2 L.Ed.2d 32 (1957), where the court said:

> " * * * the knowledge of the insured that he is making a false statement itself establishes the bad faith on the basis of which a verdict must be directed. This is such a case, since the documents in evidence make it clear that the insured must have known that he was withholding the more recent and significant part of the information requested concerning medical consultations and treatment * * * " Id. at 468.

Regardless of the opinion of federal courts concerning Pennsylvania law, we are bound to follow the Pennsylvania Supreme Court should it decide otherwise. Neither of these courts had the benefit of the Pennsylvania Supreme Court's opinion in Schleifer v. Nationwide Life Ins. Co., 421 Pa. 359, 219 A.2d 692 (1966) in reaching the decisions cited above. In *Schleifer*, after stating that "[t]he record quite clearly manifests that from all the evidence presented a serious factual dispute arose as to whether the decedent had knowingly given false answers," the Supreme Court went on to review the pertinent testimony and concluded "[f]rom all this, it is apparent that the question as to whether the applicant made any false answers *intending to deceive* the insurer was a question of fact for the jury." Id. at 361 and 362, 219

A.2d at 694 (emphasis supplied). It certainly was not error to charge the jury with language expressly used in an opinion of the Pennsylvania Supreme Court.

■ Accepting the correctness of the charge, the defendant nevertheless maintains that as a matter of law the deceased must have known the false nature of her representations, and/or must have intended to deceive the defendant. But considering the testimony of Dr. Milstein and Dr. Jones concerning her unreliability as an historian, this court is satisfied that the jury reached a reasonable result.

## II. SUICIDE

■ If a person takes his life by reason of insanity or an irresistible impulse resulting from a mental aberration or accidentally without intending to destroy himself, such an act will not void a life insurance policy which denies coverage only in case of suicide. See Tritschler v. Keystone Mut. Benefit Association, 180 Pa. 205, 36 A. 734 (1897), recently cited with approval in Johnson v. Metropolitan Life Insurance Co., 404 F.2d 1202 (3rd Cir. 1968). And in this case, the defendant limited the exclusion to "suicide." Compare Johnson v. Metropolitan Life Insurance Co., supra. (Coverage excluded for "suicide while sane or insane.")

■■ The burden of establishing that the decedent committed suicide was upon the defendant,[2] and this court submitted the question to the jury with the following charge:

> "[Here] you have a question not merely of whether the insured took an overdose of barbiturates—there doesn't seem to be any question of that either. The critical question on this defense is really the state of her mind at the time she took these barbiturates. As I see it—you may differ with me— but as I see it, you could on the evidence before you resolve that question in any one of three ways.

> If you find that Mrs. Glazer consciously took an overdose of sleeping pills for the purpose of destroying herself while she was of sound mind, then you should find for the defendant because then clearly she would have committed suicide within the legal definition of that term, which, as I said, the cases indicate 'suicide while of sound mind,' and the exclusion would apply.

> The second possibility that you could consider from this evidence is that she took the overdose of Tuinal under the stress of psychotic episode, 'while of a deranged mind,' as the cases say. Under these circumstances if you find that to be the case, then you should find for the plaintiff because the cases say that the act of taking your own life while of an unbalanced or deranged mind or while insane is not 'suicide' for purposes of avoiding liability on a life insurance policy. That is possibility number two.

> Possibility number three is that she became so accustomed to taking these barbiturates that her state of mind was merely that she wanted to go to sleep but she had become so addicted to the drugs that the dosage level that would put her to sleep was also of sufficient strength to kill her. I think it was Dr. Aronson who indicated that that happens to people who take a great deal of barbiturates for sleeping purposes, because the more they take of them the less immediate effect they have. Consequently, they can get themselves into a situation where a dosage sufficient to put them to sleep is also a critical dosage which will kill them.

> They are the three alternatives that occur to me after having listened to the evidence. You may think of some others. You are perfectly at liberty to do so.

> As to the second two, if you find either that she was of unsound or deranged mind at the time she took the dosage or that she didn't think she was taking

2. See, e. g., Watkins v. Prudential Ins. Co. of America, 315 Pa. 497, 173 A. 644 (1934).

a suicidal dosage but was merely taking enough to put her to sleep, then under those circumstances you should find for the plaintiff, because the first would not be suicide because of the deranged mind, and the second could not be suicide by any definition; it would merely be accidental death.

Finally, if you cannot decide after a thorough discussion of the evidence and a thorough discussion of the issues which of those three events occurred and any other alternative that you may come to, then you should bring in a verdict for the plaintiff because your mind will have been in balance with respect to the suicide defense. Since the burden is on the defendant to prove suicide, as the law defines it, to your satisfaction, that burden will not have been met."

Once again, because of the testimony of the doctors in this case, this court cannot overrule the jury's implicit determination that Mrs. Glazer at the time of her death was either insane or did not intend to take her life.[3]

### III.  MUTUAL RECISION

#### A.  FINDINGS OF FACT

(1) Following the death of Minnie Glazer on April 1, 1967, plaintiffs made a claim for the proceeds of her insurance policy.

(2) Defendant rejected the claim and instead tendered a return of premiums by sending a check dated June 8, 1967 in the amount of $1,483.50 payable to "Estate of Minnie Glazer, Deceased."

(3) Although it is not clear to whom the check was sent, it eventually came into Bernard Lotman's possession. Bernard was a co-administrator of his mother's estate with Abraham Glazer, the decedent's husband.

(4) He did not cash the check, but set it aside for safe-keeping.

(5) Later the check became misplaced, and by the time Bernard Lotman found it, the check was stale.

(6) Almost two years after the issuance of the original check, Bernard Lotman requested defendant to issue a new check. Defendant sent another check to him dated March 25, 1969 in the same amount as the previous check, and also payable "To the Estate of Minnie Glazer, Deceased."

(7) Shortly thereafter, Bernard Lotman endorsed the check as follows: "Estate of Minnie Glazer, Deceased, Bernard Lotman, Administrator C.T.A."

(8) In April, 1969, Bernard Lotman deposited the check in a joint bank account which he maintained with his brother Charles. The account contained only personal funds of the brothers.

(9) There was no separate bank account for the estate.

(10) Bernard Lotman deposited the refund of premiums for the purpose of safe-keeping in his role as co-administrator of his mother's estate.

(11) By depositing the check, he did not intend to compromise any claim to the proceeds as co-beneficiary of the policy.

(12) Charles Lotman did not know that his brother intended to deposit the check in their bank account until he had already done so.

(13) After finding out about the deposit, Charles was of the opinion that his brother had just put the check aside in his role as executor.

(14) Charles Lotman did not intend that the deposit would compromise his claim to the insurance proceeds.

(15) On July 7, 1969, Bernard Lotman, by his counsel, forwarded to counsel for the defendant a check in the amount of $1,483.50 dated July 2, 1969, and payable to defendant.

(16) Counsel for the defendant refused this tender and returned the check to counsel for plaintiffs.

#### B.  CONCLUSIONS OF LAW

█ There was no binding recision or compromise which would bar the asser-

---

3.  Dr. Jones explained to the jury that the term "insane" that is used by laymen is roughly equivalent to "psychosis" as used by psychiatrists.

tion of the plaintiff's claim for the following reasons:

(1) Defendant never made an offer to the plaintiffs to rescind or compromise their rights to the proceeds under the policy.

(2) Even if such an offer was made, neither plaintiff ever evidenced an intention to accept defendant's offer.

## C. DISCUSSION

Although there are no Pennsylvania cases directly on point, it is well established in other jurisdictions that if a bona fide dispute arises as to the right of beneficiaries to collect under the terms of an insurance policy, return of the premiums by the insured and acceptance by the beneficiaries will discharge the insurance company from any further liability.[4] This discharge is said to be based upon mutual recision, and the compromise of the doubtful right to the entire proceeds constitutes sufficient consideration to support the agreement to accept a lesser sum.[5]

Yet this general rule does not help the defendant in this case because here we can infer from the face of the check that the insurance company made an offer of recision to the *estate of the insured* and not to the beneficiaries.

In Oplinger v. New York L. Ins. Co., 253 Pa. 328, 332, 98 A. 568, the Supreme Court stated:

"After the death of the insured, the defendant company could not change the status of the beneficiary by an attempted recision of the insurance contract." [6]

Hence we conclude that the check in question did not constitute an offer of recision to the beneficiaries of the policy, and therefore plaintiffs were never in a position to accept a compromise of the disputed claim.

Defendant asserts that because Bernard Lotman cashed the refund check and deposited the proceeds in a joint bank account, it is established as a matter of law that the beneficiaries agreed to a compromise of the disputed right. But even ignoring the fact that according to the face of the check the offer was made to the estate, defendant still cannot prevail. We have found that Bernard Lotman intended to act as administrator of the estate in endorsing and depositing the check, and was not wearing the hat of a beneficiary at the time.

As the co-administrator of his mother's estate, Bernard had a legal duty to marshal and preserve the assets of the estate. He would have been in breach of his fiduciary duty if he had returned the refund check to the defendant or refused to exercise dominion over it. Consequently, even if an offer had been made to him, he did not agree to compromise his claim.

As to Charles Lotman, we have found that he knew *nothing of his brother's* intention to deposit the check in their joint account. Moreover, after discovering that fact, his state of mind was such that he thought the deposit was simply a way for his brother to set the check aside. Thus, assuming *arguendo* the existence of an offer, he did not intend to accept a compromise of any right to the full amount of the proceeds either.[7]

Accordingly, we find that under all of the facts of this case, there was no binding recision which would bar the assertion of the plaintiffs' claim.

4. See Billington v. Prudential Insurance Co. of America, 254 F.2d 428 (7th Cir. 1958); Peterson v. New York Life Insurance Co., 185 Minn. 208, 240 N.W. 659 (1932); Tully v. New York Life Insurance Co., 228 App.Div. 449, 240 N.Y.S. 118 (1930).

5. Pennsylvania recognizes that a compromise of doubtful rights does not fail for lack of consideration. See, e. g., Thrasher v. Rothrock, 377 Pa. 562, 105 A.2d 600 (1954).

6. See generally, 2 Goldin's The Law of Insurance in Pennsylvania 681 (2nd Ed. 1946).

7. The fact that the bank account was a joint one between the two beneficiaries is not dispositive in light of these other facts.