Bernard LOTMAN and Charles Lotman

v.

SECURITY MUTUAL LIFE INSURANCE COMPANY OF NEW YORK, Appellant.

No. 71-2085.

United States Court of Appeals, Third Circuit.

Argued Jan. 18, 1973.

Decided April 26, 1973.

Edward W. Madeira, Jr., James T. Giles, Pepper, Hamilton & Scheetz, Philadelphia, Pa., for appellant.

David F. Binder, Philadelphia, Pa., for appellees.

Before VAN DUSEN and ADAMS, Circuit Judges, and BARLOW, District Judge.

## OPINION OF THE COURT

VAN DUSEN, Circuit Judge.

After the district court entered its September 23, 1971 order denying defendant's motion for judgment n. o. v. and for new trial,[1] the defendant, Security Mutual Life Insurance Company of New York (hereafter Security Mutual), filed this appeal from a February, 1971 judgment entered on the verdict of a jury.

The plaintiffs,[2] co-beneficiaries of a life insurance policy issued to the decedent[3] by Security Mutual, brought this action to recover the proceeds under the decedent's policy. Security Mutual refused payment claiming three separate defenses: (1) the insured obtained her policy by fraud and misrepresentation; (2) her death from barbiturate poisoning was the result of suicide; and (3) the acceptance by the plaintiffs of a tendered check representing a return of the premiums paid under the policy constituted a mutual recision and waived any claim by the plaintiffs for proceeds under the policy.

A jury found in favor of the plaintiffs on the first two of these defenses. The claim of mutual recision was reserved by agreement between the parties for separate determination by the court on the basis of the deposition testimony of the plaintiffs. After completion of the trial, the court held that the plaintiffs' conduct did not constitute mutual recision and did not amount to a waiver of their claim to the proceeds of the life insurance policy.

The defendant raises three contentions in its appeal. Two contentions deal with the court's charge to the jury: that it erred in its instructions that the defendant had the burden of proving that the false answers given by the insured in the application for her insurance policy were made in bad faith for the purpose of deceiving it; and that the court erred in its instructions on the presumption of Minnie Glazer's sanity. Security Mutual also reasserts its claim that the conduct of the plaintiffs consti-

---

1. The opinion of the district court is reported at 332 F.Supp. 350 (E.D.Pa.1971).

2. The plaintiffs in this action are Bernard Lotman and his brother Charles Lotman.

3. The decedent, Minnie Glazer, was the plaintiffs' mother.

tuted an agreement of mutual recision of the policy.

On March 31, 1966, the insured applied to Security Mutual for a $25,000 life insurance policy. On April 2, 1966, Dr. Kermit Snyder, who performed medical examinations for Security Mutual, went to Minnie Glazer's apartment and completed the medical application and examination required for insurance. (N.T. 118).[4] It is clear that false and material misstatements were made by insured and that Security Mutual would not have issued the policy had correct information been provided.[5] The most significant of the misrepresentations in the answers given by the insured during the medical examination were as follows:

"Part II.

"2. To the best of your knowledge and belief have you ever had or been treated for:

A. Epilepsy, convulsions, mental or nervous disorder?

.    .    .    .    .    .

"3. Have you:

A. Had one or more electrocardiograms?

.    .    .    .    .    .

C. Been in a clinic, hospital or sanitorium for treatment, observation or diagnosis?

.    .    .    .    .    .

"5. Have you within the past 5 years consulted a physician or surgeon for any examination or treatment not already mentioned?"

The insured answered "No" to each of these questions and then signed the application in the presence of Dr. Snyder, who also signed.[6]

However, her medical history, as revealed at trial, showed that she was admitted as a mental patient in need of immediate temporary care at Wissahickon Hall [6a] a private psychiatric hospital, in October of 1962. (N.T. 35). At that time she was diagnosed as psychotic depressive reaction. Six electro-shock treatments were administered. (N.T. 82–83). After six months at Wissahickon Hall the insured was discharged on an out-patient basis. However, a year later her symptoms were recurring and she continued to take medication. Nevertheless, a policy was issued by Security Mutual to Minnie Glazer in the amount of $25,000 on May 10, 1966 and on April 11, 1967 she died from barbiturate poisoning. (N.T. 11–12).

I.

The first issue is the propriety of the trial judge's instructions to the jury on whether the insured had (a) knowledge of the falsity of the answers in Part II of the application and (b) an intention to deceive the insurer.

■ The most recent Pennsylvania appellate court decision, quoting from that court's earlier decision in Baldwin v. Prudential Insurance Company of America, 215 Pa.Super. 434, 258 A.2d 660 (1969), on the defense to an insurance policy based on false and fraudulent misrepresentations, makes clear that " '[t]here are three elements that an insurer must establish to void a policy in the case of misrepresentation. These are: (1) the declaration must be false; (2) its subject matter must be material to the risk; and (3) the applicant must have known it to be false or must have made the statement in bad faith.' " Bremmer v. Protected Home Mutual

---

4. See Exhibit B, attached to defendant's Answer, entitled: "Application for Life/Sickness & Accident Insurance in Security Mutual Life Insurance Company of New York, Binghamton, N. Y."

5. See testimony by Dr. Vincent Hammond, Vice-President, medical director, Security Mutual Life Insurance Company at N.T. 167.

6. Exhibit B, *supra* note 4.

6a. Prior to admission to Wissahickon Hall, she had been taken to Women's Medical College Hospital as a result of an overdose of medication which rendered her unconscious. At that Hospital she was treated for intoxication of barbiturates.

Life Insurance Co., 218 Pa.Super. 364, 280 A.2d 664, 665 (1971).

In *Bremmer*, the court continued, using this language:

"Considering the close proximity of the doctors' visits to the examination, the applicant certainly knew the statements were false, and the jury could infer the requisite bad faith." *Id.*

Contrary to the law as stated in the *Bremmer* case, the trial judge charged the jury as follows:

"The dispute is as to whether or not those inaccuracies were consciously made by the insured in bad faith. 'In bad faith,' is just another way of saying, 'for the purpose of deceiving the insurance company.' On this issue, the burden is on the defendant to persuade you that that was the state of mind of Mrs. Glazer at the time she answered these questions and made the statements that appears in the policy." (Charge, Doc. 17 at 6–7).

■ Plaintiffs rely on Schleifer v. National Life Insurance Co., 421 Pa. 359, 362, 219 A.2d 692, 694 (1965) to support the above language in the charge. In *Schleifer* there was a serious factual dispute over whether the insured knowingly gave false answers to a question in the application that he was being treated for a heart condition. The *Schleifer* court felt that because of the serious dispute as to whether the insured knew at the time of his examination that he might be suffering from a heart condition, the question of whether the insured intended to deceive the insurer was for the jury. The particular facts of *Schleifer* are inapposite to the facts developed on this record. This appeal involves a situation comparable to

that in *Bremmer*. In both of these cases, the insured visited a physician, was aware of his or her condition, and then failed to convey that important information to the insurer. *Bremmer* only requires that the defendant prove that the applicant knew his or her representation "to be false" and does not require it to prove that inaccurate representations were made "for the purpose of deceiving the insurance company."

## II.

Alleging that the decedent committed suicide, the defendant relied upon the following clause of the decedent's insurance policy:

### "SUICIDE

"If the death of the Insured shall result from suicide within two years from the Issue Date, the liability of the Company under this policy shall be limited to the amount of premiums paid less any dividends paid in cash or used in reduction of premium and less any indebtedness to the Company under the policy." [7]

Dr. Marvin Aronson, then the Acting Medical Examiner for the City of Philadelphia, testified that in his opinion Minnie Glazer swallowed "between 12 and 20 capsules . . . in a period of one half to two hours prior to death. . . . The high concentration in [her] stomach indicates that these capsules were taken in effect at once during the same three- or four-minute period of time." (N.T. 180).[8]

■ The court properly left to the jury the question of whether the ingestion by Minnie Glazer of a large quantity of barbiturates constituted suicide.[9]

7. Exhibit A, attached to plaintiffs' Complaint.

8. Dr. Aronson was not asked to express a medical opinion as to whether or not the decedent committed suicide, although he suggested on cross-examination by the plaintiffs that in his experience an overdose of barbiturates was a frequent manner of suicide. He explained: " . . . it is my reasoning . . . that if a

person takes 10 times the doses of medication which is the usual one that they should be aware that they are in serious danger of taking their life as well." (N. T. 191).

9. The court in its charge to the jury included the following instruction for the resolution of the question of suicide:

"The critical question on this defense is really the state of her mind at the time

However, the court improperly relied upon certain language in Tritschler v. Benefit Association, 180 Pa. 205, 36 A. 734 (1897). Quoting from *Tritschler*, the court instructed the jury as follows:

> "It is settled in this State that a policy of insurance which provides that it shall be void if the insured shall die by suicide is not forfeited by the insured destroying himself, he being insane at the time but intending to take his life and knowing that death would result from the act. The ground upon which said conclusion rests is that in legal acceptation and in popular use the word suicide is employed to characterize the crime of self-murder; that self-destruction under insane impulses so strong as to be beyond the control and restraint of the will is a result produced by disease, for which the victim of it is no more morally responsible than he would be for any other of the maladies of which men die." (Charge, Doc. 17 at 7–8; see *Tritschler*, at 206–207, 36 A. 734).

■ Defendant was entitled to an instruction pursuant to Point 8 of its Request for Instructions [10] dealing with the definition of insanity which was taken from Ritter v. Mutual Life Insurance

she took these barbiturates. As I see it—you may differ with me—but as I see it, you could on the evidence before you resolve that question in any one of three ways.

"If you find that Mrs. Glazer consciously took an overdose of sleeping pills for the purpose of destroying herself while she was of sound mind, then you should find for the defendant because then clearly she would have committed suicide within the legal definition of that term, which, as I said, the cases indicate 'suicide while of sound mind,' and the exclusion would apply.

"The second possibility that you could consider from this evidence is that she took the overdose of Tuinal under the stress of a psychotic episode, 'while of deranged mind,' as the cases say. Under those circumstances if you find that to be the case, then you should find for the plaintiff because the cases say that the act of taking your own life while of an unbalanced or deranged mind or while insane is not 'suicide' for purposes of avoiding liability on a like insurance policy. That is possibility number two.

"Possibility number three is that she had become so accustomed to taking these barbiturates that her state of mind was merely that she wanted to go to sleep but she had become so addicted to the drugs that the dosage level that would put her to sleep was also of sufficient strength to kill her. I think it was Dr. Aronson who indicated that that happens to people who take a great deal of barbiturates for sleeping purposes, because the more they take of them the less immediate effect they have. Consequently, they can get themselves into a situation where a dosage sufficient to put them to sleep is also a critical dosage which will kill them.

"They are the three alternatives that occur to me after having listened to the evidence. You may think of some others. You are perfectly at liberty to do so.

"As to the second two, if you find either that she was of unsound or deranged mind at the time she took the dosage or that she didn't think she was taking a suicidal dosage but was merely taking enough to put her to sleep, then under those circumstances you should find for the plaintiff, because the first would not be suicide because of the deranged mind, and the second could not be suicide by any definition; it would merely be accidental death.

"Finally, if you cannot decide after a thorough discussion of the evidence and a thorough discussion of the issues which of those three events occurred and any other alternative that you may come to, then you should bring in a verdict for the plaintiff because your mind will have been in balance with respect to the suicide defense. Since the burden is on the defendant to prove suicide, as the law defines it, to your satisfaction, that burden will not have been met." (Charge, Doc. 17 at 8–11).

10. Point 8 stated: "If you find that the overdose of barbiturates was taken by Minnie Glazer with the intent of self-destruction while having the capacity of mind to understand what she was doing, and the consequences to herself, her character, her family and others, and to comprehend the wrongfulness of the act, then you must find that Minnie Glazer committed suicide and return the judgment for defendant, Security Mutual Life Insurance Company of New York.

Co., 69 F. 505 (3 Cir. 1895), aff'd, 169 U.S. 139, 18 S.Ct. 300, 42 L.Ed. 693 (1897). Point 8 contains a definition of what is meant by the term "insanity" as it applies to a suicide under an insurance contract. In *Ritter*, the court, apparently relying on language found in American Life Insurance Co. v. Isett's Administrator, 74 Pa. 176 (1873), stated:

> "We are not to enter the domain of metaphysics in determining what constitutes insanity, so far as the subject is involved in this case. If [the insured] understood what he was doing, and the consequences of his act or acts, to himself as well as to others; in other words if he understood as a man of sound mind would, the consequences to follow from his contemplated suicide, to himself, his character, his family and others, and was able to comprehend the wrongfulness of what he was about to do as a sane man would, then he is to be regarded by you as sane." *Ritter, supra* 69 F. at 506.

*Tritschler* and the more recent decision in Johnson v. Metropolitan Life Insurance Co., 404 F.2d 1202 (3rd Cir. 1968),[11] which the court relied upon in its order denying defendant's motion for judgment n. o. v. and for new trial, are both inapplicable because of a crucial factual difference from this record. In both of those cases the record contained an admission that the decedent was insane at the time of suicide.

■ In addition, the charge failed to instruct the jury that under Pennsylvania law the defendant was entitled on this record to an instruction that the insured was presumed to be sane if the jury believed that she committed suicide when she could comprehend and understand the probable fatal result of taking the

11. We note that in *Johnson*, New Jersey law was applied, while the present action arises under Pennsylvania Law.

12. See Defendant's REQUEST FOR INSTRUCTIONS, ¶ 9, which states:
"9. A contract of life insurance contains an implied condition that the in-

overdose of barbiturates. Neither *Tritschler*, nor *Johnson* addressed themselves to that particular question.

■ In Pennsylvania, sanity is presumed to be a normal condition of the mind, and there is a legal presumption that every one is sane until the contrary is established by evidence sufficient to satisfy a jury. An allegation of insanity casts the burden of proof upon the party asserting it. In *Isett's Administrator,* the trial court charged the jury as follows:

> "Insanity is an abnormal condition of the mind, and the legal presumption is that every one is sane until the contrary is established by evidence sufficient to satisfy a jury, and it is incumbent upon the party alleging insanity to prove it by affirmative evidence."

*Isett's Administrator, supra* 74 Pa. at 178. In affirming the judgment entered on the jury's verdict for the plaintiff, the court used this language:

> "If taken as a whole, [the charge] was not calculated to mislead the jury, it is not error.

> •  •  •  •  •  •

> "We do not think the learned judge erred therein."

*Id.* at 181 see *Ritter, supra* 69 F. at 507–508; cf. Supreme Council of Royal Arcanum v. Wishart, 192 F. 453 (3d Cir. 1912); Youngwood Building & Loan Ass'n v. Henry, 137 Pa.Super. 124, 8 A. 2d 427, 428 (1939); McClaney v. Scott, 188 Pa.Super. 328, 146 A.2d 653 (1958).

■ Instead, the court refused defendant's request for an instruction that if the jury found that Minnie Glazer took an overdose of barbiturates with the intent to commit suicide, the law presumed that she was sane at the time of committing the act.[12] The 19th Cen-

sured will not intentionally terminate his own life. The law presumes that one who has taken his life by his own hands was sane at the time of committing the act. The fact of suicide does not establish that Minnie Glazer was less than sane when the act of self-destruction

tury decisions in *Isett's Administrator* and *Ritter* still appear to be valid on the issue of whether decedent was sane or insane at the time of the taking of his life.

■ Finally, the charge was misleading where, after explaining that "the mere commission of 'suicide' or the fact of self-destruction in and of itself is not evidence of insanity," it was noted: ". . . you cannot infer suicide merely from the fact of self-destruction." At the least, the court should have added that you cannot overcome the presumption of sanity by the act of committing suicide. See *Ritter, supra* at 508 of 69 F.

■ Under *Ritter* and *Isett's Administrator,* the defendant was entitled to an instruction that the decedent was sane at the time of injesting the overdose of barbiturates, unless the plaintiffs had sustained their burden of rebutting the presumption of sanity.

### III.

Security Mutual also submits that the district court erred when it concluded that there had been no mutual recision by the plaintiffs. In support of its contention, it argues that after the plaintiffs made a claim for the proceeds of Minnie Glazer's insurance policy, it rejected that claim and instead tendered a return of premiums by sending a check on June 8, 1967 in the amount of $1,483.50 payable to the "Estate of Minnie Glazer, Deceased." Bernard Lotman,[13] a co-administrator of her estate, eventually received that check. He retained the check, but did not deposit it. Almost two years later after the check was stale, it was misplaced. B. Lotman requested the defendant to issue him a new check. The defendant sent him another check in the same amount and also payable to the "Estate of Minnie Glazer, Deceased." This check B. Lotman endorsed: "Estate of Minnie Glazer, Deceased, Bernard Lotman, Administrator C.T.A." He deposited it in a joint bank account which he maintained with his brother Charles.

■ Although it has been held that a beneficiary of a life insurance policy may, after the death of the insured, accept a return of premiums and waive all claims thereafter to the policy's proceeds, see Peterson v. New York Life Insurance Co., 185 Minn. 208, 240 N.W. 659 (1932),[14] the district court concluded that "the insurance company made an offer of recision to the *estate of the insured* and not to the beneficiaries." 332 F.Supp. at 356. The court found that B. Lotman "deposited the refund of premiums for the purpose of safe-keeping in his role as co-administrator of his mother's estate" and "he did not intend to compromise any claim to the proceeds as co-beneficiary of the policy." *Id.* at

---

was committed. Ritter v. Mutual Life Insurance Co. of New York, 69 F. 505 (Circuit Court, E.D.Pa. 1895; aff'd 138 U.S. 139 [18 S.Ct. 300, 42 L.Ed. 693] (1897)." App. 289a–290a.

The court instructed:

"There is something that is known as the legal presumption of sanity. If there isn't any evidence to the contrary, it is presumed that people are sane when they do whatever they do. Here that presumption is faced with record evidence that the person in question had had at least two, what the psychiatrists call, 'frank psychotic episodes' before the occurrence in question."

Charge, Doc. 17, at 11.

The defendant took exception to this language as required by F.R.Civ.P. 51. Counsel stated: "I have met my burden [that Minnie Glazer committed suicide]. If [plaintiffs] want to come forward . . . and show that she is mentally insane or mentally at such a condition that would set aside a normal suicide, they ought to do it with competent medical evidence." (N.T. 274).

13. See *supra* note 2.

14. Neither the district court, nor counsel have been able to discover any Pennsylvania cases directly raising this point, although, as noted by the district court, it has been raised in other jurisdictions. See 332 F.Supp. at 356, n. 4.

355.[15] We are unable to say that these findings of fact are clearly erroneous. F.R.Civ.P. 52(a). Therefore, the conclusion of the district court that there was no binding recision which would bar the assertion of plaintiffs' claim was not erroneous.

We have concluded that the errors in the charge set forth in Parts I and II require a new trial. For the foregoing reasons the judgment will be reversed and the case will be remanded for a new trial consistent with this opinion.

Judge Adams concurs in the conclusions reached in Parts I and II of the foregoing opinion and concurs in the result reached remanding this case for a new trial.

---

15. B. Lotman in his deposition made the following statements:

"There was no account for the estate of Mrs. Glazer. As administrator, I deposited this money into an account with my brother and myself for safekeeping.

. . . . .

"I didn't cash the check. . . . I deposited the check . . . for safekeeping.

. . . . .

". . . I made out a deposit slip, put it in the account, never touched it." (Deposition of Charles and Bernard Lotman, June 26, 1969 at 27, 36).