Merle A. WOLFSON and Jane A. Kneidinger, Co-Executors of the Estate of Louis C. Kneidinger, Plaintiffs,

v.

MUTUAL LIFE INSURANCE CO. OF NEW YORK, Defendant.

Civ. No. 75–940.

United States District Court,
M. D. Pennsylvania.

April 3, 1978.

Patrick E. Dougherty, Wilkes-Barre, Pa., for plaintiffs.

Andrew J. Hailstone, Michael J. Donohue, Scranton, Pa., for defendant.

MEMORANDUM

NEALON, Chief Judge.

Plaintiffs, as co-executors of the estate of the decedent Louis C. Kneidinger, brought this action against the insurer for the proceeds of three insurance policies with death benefits totalling $125,000. After trial the jury found for plaintiffs and awarded the total policy amounts. Defendant timely filed a motion for judgment notwithstanding the verdict, or in the alternative for a new trial, on several grounds, two of which were mentioned and argued in its supporting brief.[1] First, it is contended that the court erred in admitting into evidence statements made by plaintiffs' decedent shortly after a meeting with his insurance agent. Secondly, it is contended that the court's instructions to the jury did not correctly state the Pennsylvania law governing an insurer's avoidance of payment on grounds of fraud. The motion became ripe on January 17, 1978. Defendant's motion will be denied.

Plaintiffs made out a prima facie case for recovery under the policies by showing the existence of the contracts, the payment of premiums, and the death of the insured. Defendant's evidence indicated that plaintiffs' decedent was under a doctor's care for diabetes mellitus from December 8, 1971 through November 9, 1974, but that, in answers to questions posed to plaintiffs' decedent during examinations by a paramedic, plaintiffs' decedent stated that he had no knowledge of, and had never been treated for "diabetes, or anemia, or other blood disorder." The medical examinations occurred on April 16, 1974, and January 9, 1975, shortly after meetings (held April 15, 1974, and January 6, 1975, respectively) that plaintiffs' decedent had with the insurance agent, Herbert Rittenberg, for the purpose of taking the decedent's applications. It was plaintiffs' position that the agent had,

1. The other grounds asserted in the motion (refusal to instruct on collusion, an error in summarizing the evidence for the jury, and the claimed absence of evidentiary support for the verdict) were not mentioned or discussed in the supporting brief. I am satisfied that these other grounds are not meritorious.

at those meetings, assured decedent that his diabetes would not have to be reported at the examinations because decedent was being treated by dietary control and not insulin and that only if insulin were involved did defendant insurer require a reporting of the medical condition and of the doctor's treatment for it.

As evidence of those assurances, plaintiffs introduced into evidence the testimony of decedent's business partner, Nelson Snyder, who testified that he overheard the agent make the assurance, and the testimony of the business partner and decedent's spouse that they heard decedent report, immediately after the meetings with the agent, that the assurances had been made. First, over defendant's objection on hearsay grounds, decedent's spouse (a co-plaintiff here) testified that, when the January 6 meeting terminated and immediately after the insurance agent had departed, decedent stated to her and the business partner that the agent had again assured him that he need not list the condition and the treatment since no insulin was involved. She also noted that the decedent made a statement of a similar assurance in 1974. N.T. 167–70. On cross-examination defendant elicited the information that the 1974 statement by decedent had been made several hours after the April 15 meeting with the agent. N.T. 177. Secondly, plaintiffs

sought to introduce the testimony of decedent's business partner. Again over defendant's hearsay objections, it was his testimony that the decedent reported the assurance immediately after the January 6 meeting broke up, and that he actually overheard the insurance agent make the assurance to the decedent.[2] N.T. 191–98. The proffered testimony was admitted under exceptions to the hearsay rule.

The insurance agent, as a witness for defendant, flatly contradicted the testimony of decedent's spouse and business partner. It was the agent's testimony that he had no knowledge of decedent's diabetes and related medical treatment, that decedent had never informed him of the condition or treatment, and that he had never given decedent assurances that the medical questions regarding diabetes could be answered negatively.

Thus, there was a clear conflict in the testimony for the jury to resolve. But even if plaintiffs' version of the conversations were believed, jury questions remained on the issue of whether decedent had acted fraudulently so as to permit defendant to avoid policy payments. For example, even if the jury believed that the assurances had been made, could the jury nevertheless conclude that the answers to the medical question were in a technical sense "knowingly

2. Decedent's business partner was questioned by plaintiffs' attorney:

Q Now, at some point after you arrived there and sat down at your desk did you have occasion to overhear a conversation between Mr. Kneidinger [the decedent] and Mr. Rittenberg [the agent] concerning the insurance applications of January, 1975?

A Yes, I did.

Q And can you tell us the context of the conversation which you overheard?

MR. HAILSTONE: If the Court please, I have an objection to this as being hearsay.

THE COURT: Objection's overruled.

THE WITNESS: May I proceed?

MR. DOUGHERTY:

Q Yes, you may. And once again, as I said with Mrs. Kneidinger, attempt to indicate as close as possible the words of the party speaking, what was said, and as factually, as great a detail as you can recall?

A O. K. Mr. Kneidinger asked Mr. Rittenberg if there would be any problem with the

insurance application concerning his past medical history and his examinations at Geisinger.

Q Now, did Mr. Rittenberg respond to that question?

A He responded that there would be no problem with the application.

Q Now, aside from that comment were any other statements made by Mr. Rittenberg to Mr. Kneidinger concerning the insurance application which you overheard?

A Yes, he, in addition to saying there would be no problem with the application, he indicated to Mr. Kneidinger—

MR. HAILSTONE: If the Court please, I have an objection to what he indicated.

THE COURT: You'll have to tell us what you heard him say, not what you thought he indicated.

THE WITNESS: I heard Mr. Rittenberg state to Mr. Kneidinger that the medical examination would be conducted by a paramedic rather than a doctor and that there would be no problem. N.T. 191–92.

false"? There was evidence in the record from which the jury could conceivably conclude that decedent's knowledge of his condition and treatment meant that he "knew" his answers to the medical question were "false." On the other hand, the medical question asked of decedent was whether he had "diabetes . . . or other blood disorder." If "diabetes" as it was explained to him did not include decedent's condition because he was not being treated with insulin, could not the jury conclude that there was no "knowing falsity"? As will be discussed, the instructions minimized the potential for juror confusion by emphasizing the central element, in a case of this nature, of fraudulent action: the issue of good or bad faith on the part of the assured.

### Instructions on the Issue of Fraud in Obtaining the Insurance Policies

Defendant contends that the instructions to the jury on the crucial question of whether plaintiff's decedent obtained the policy fraudulently were erroneous. Defendant requested that the court charge the jury that if decedent "knew, at the time he filled out the [medical questionnaire], that representations contained [therein] were false, you must find for the defendant," and also requested a charge that if the insurance agent advised decedent "to make misrepresentations on the [medical questionnaire], you must nevertheless find for the defendant if you find that [decedent] made the statements, knowing that they were false." Under the circumstances of this case, the giving of the requested instructions would, without further clarification, have been a misstatement of Pennsylvania law.

To sustain its burden of showing that plaintiffs' decedent fraudulently obtained the insurance policies, defendant was required to show that material statements were false and the statements were knowingly false with a fraudulent, i. e. bad faith, intention. See Evans v. Penn Mutual Life Ins. Co. of Philadelphia, 322 Pa. 547, 550–52, 186 A. 133 (1936); Underwood v. Prudential Ins. Co., 341 Pa.Super. 27, 359 A.2d 422 (1976); Bremer v. Protected Home Mutual Life Ins. Co., 218 Pa.Super. 364, 365–66, 280 A.2d 664 (1971). See also Woods v. National Life and Accident Ins. Co., 347 F.2d 760, 767 (3d Cir. 1965).[3] While knowing "falsity" is presumptively fraudulent, Evans, 322 Pa. at 553, 186 A. 133; Underwood, 359 A.2d at 425, when there is a "serious dispute" as to the insured's knowledge of a material "falsity," the central question then is the intention to deceive and that question is for the jury. Lotman v. Security Mutual Life Ins. Co. of New York, 478 F.2d 868, 871 (3d Cir. 1973).[4] See also Allstate Ins. Co. v. Stinger, 400 Pa. 533, 540, 163 A.2d 74 (1960).

The facts of this case warranted an instruction on bad faith. If the jury believed plaintiffs' version of the conversations between decedent and the insurance agent, it would appear to the jury that decedent had some basis for giving the medical question an interpretation different from its literal interpretation.[5] The jury would then be in the difficult position of trying to decide whether decedent's answers were "knowingly false" without guidance as to the broader principles involved.

---

3. The parties in their briefs focus considerable attention on the question of whether the Pennsylvania standard should, in general, be stated disjunctively or conjunctively, i. e. whether defendant must show knowing falsity *and* bad faith or knowing falsity *or* bad faith. As the seminal case of *Evans v. Penn Mutual* indicates, bad faith and knowing falsity are alternate ways of showing the requisite fraudulent intent. 322 Pa. at 553, 186 A. 133. *See, e. g., Lynch v. Metropolitan Life Ins. Co.*, 427 Pa. 418, 424–25, 235 A.2d 406 (1967) (falsity clear, but no showing of knowledge or falsity or bad

faith). Thus, the basic question is whether there is fraudulent intent, and ambiguity in the question of knowing falsity necessitates an instruction on bad faith. *See* discussion *infra.*

4. The court in *Lotman* found no ambiguity in the facts of the case before it and held it was therefore error for the trial court to instruct the jury that it must find bad faith (i. e. an intent to deceive) to find for the insurer-defendant.

5. *Compare Underwood*, 359 A.2d at 425 (no misrepresentation of questions to insured).

In *Evans* the Pennsylvania Supreme Court distinguished between a warranty of a material fact by an insured (which, if merely false, results in an avoidance of the policy) and a representation of a material fact (which results in an avoidance only when the false representation is fraudulently made). 322 Pa. at 550–53, 186 A. 133. Decedent's answers to the medical question were, of course, representations. The danger to be avoided in the circumstances of this case was the risk that the jury would in effect apply the standard for a warranty. Consequently, it had to be made clear to the jury that defendant could prevail only if it demonstrated that a false representation was made fraudulently. *Id.* at 553, 186 A. 133. Thus, the jury was charged that defendant had to prove that decedent "not only knew that the representation was false," i. e. false in a strict sense, "but that he made the representation in bad faith. . . ."[6] The circumstances of this case required, in light of the central principle that a policy can be avoided only if false representations are made fraudulently, the use of a bad-faith instruction.[7] I need not decide that such an instruction is always appropriate in these cases but only that the instruction was appropriate here. *See Lotman,* 478 F.2d at 871.

### Admission of Hearsay Statements on the Issue of Decedent's Good Faith

■ Defendant argues that the testimony of decedent's spouse and business partner regarding statements allegedly made to and by decedent should have been excluded as hearsay not within any exception. *See generally* Fed.R.Evid. 801 *et seq.;* 4 J. Weinstein & M. Berger, Weinstein's Evidence ¶¶ 800[03] & 801(c)[01] (1977). As discussed in more detail supra, decedent's spouse testified that decedent had made statements, to the effect that assurances had been given him by the insurance agent, (1) several hours after he met with the agent on April 15, 1974, and (2) immediately after the meeting January 6, 1975. Decedent's business partner testified (3) that he overheard the agent at the January 6 meeting give an assurance and (4) that he also heard the statement made by decedent immediately after the meeting.

The question is whether the four distinct items of testimony are each hearsay, and, if so, whether they are within exceptions to the hearsay rule.

Rule 803(1) of the Federal Rules of Evidence permits the introduction of a hearsay statement that describes or explains an event or condition and that was made while the declarant was perceiving the event or condition, or immediately thereafter. The "present sense impression" rule, although infrequently applied, *see* Weinstein & Berger, *supra,* ¶ 803(1)[01], may very well encompass the testimony of the spouse and business partner regarding the statement made immediately after termination of the January 6 meeting. However, since "substantial contemporaneity" is required, *see* Advisory Committee Note on Rule 803, Weinstein & Berger, *supra,* at 803–33, the

---

**6.** The instructions continued:

> [T]he plaintiff in this instance denied [this] requirement. That is that these answers were made in bad faith. And the defendant must prove bad faith on the part of the decedent.
>
> . . . . .
>
> Defendant has offered documentary evidence . . . and . . . testimony . . . to establish bad faith.
>
> . . . . .
>
> On the other hand the plaintiff contends that there was no bad faith and that the answers were omitted because [the agent] told [decedent that the diabetes condition and treatment] need not be listed so long as decedent was not taking insulin.

> . . . . .
>
> Now, members of the jury, the term bad faith is defined as fraud, dishonesty, or corruption. It is a state of mind acting with the intent to mislead or deceive. . . .
>
> [T]he defendant seeks to set aside each of these policies because they were fraudulently obtained. . . . The sole disputed issue, it appears, is whether [decedent] acted in bad faith when he filled out the applications for each of these policies.
>
> N.T. 454–57.

**7.** *See* N.T. 397–98 (colloquy with counsel at side bar).

testimony of the spouse regarding the other statement of decedent hours after the April 15 meeting may not be within the exception. *See* Weinstein & Berger, *supra,* at 803–74. Assuming that the business partner's testimony concerning the overhearing of the agent's assurances was hearsay,[8] this testimony would probably not be within the 803(1) exception since it might not be considered a present sense impression on the part of the agent but rather an assertion of pre-existing fact by him. In any event it is not necessary for me to decide whether Rule 803(1) applies to any of the testimony admitted.

All four items of testimony would be admissible on the issue of decedent's good faith, either as a nonhearsay statement or as an exception under Rule 803(3) (state of mind).[9] As has already been discussed, defendant attempted to establish at trial that plaintiffs' decedent answered questions falsely and fraudulently. Decedent's state of mind was a highly material issue and, as indicated by the court's instructions, the one upon which the case turned. Rule 803(3) permits the introduction of hearsay statements relevant to the question of the declarant's then existing state of mind, "but not including a statement of memory or belief to prove the fact remembered or believed." The testimony of the spouse and business partner regarding statements decedent made after his meetings with the insurance agent were not allowed for purposes of proving that the insurer had dispensed in decedent's circumstances with requiring affirmative responses to the medi-

cal question, but rather were allowed into evidence for, and relevant only to, decedent's state of mind.[10] N.T. 455–56. Since these three items of testimony tended to show a lack of fraudulent intent on decedent's part, they were admissible. *See* Weinstein & Berger, *supra,* ¶ 803(3)[03]; *Nuttall v. Reading Co.,* 235 F.2d 546, 551–52 (3d Cir. 1956). *See also United States v. Taglione,* 546 F.2d 194, 200–01 (5th Cir. 1977); *Blackburn v. Aetna Freight Lines, Inc.,* 368 F.2d 345 (3d Cir. 1966).[11] A fourth item of testimony, that of the business partner concerning his overhearing of assurances given by the insurance agent, did not constitute hearsay since the existence of such assurances was itself in issue at trial and was offered directly to show effect upon decedent's state of mind. *See* Weinstein & Berger, *supra,* ¶ 801(c)[01], at 801–62 to 801–63. I was made aware prior to trial that this testimony would be offered, and considered the proffered testimony of direct overhearing as a factor bearing on the admissibility of the hearsay testimony.

Plaintiffs also seek to justify the introduction of the four items of testimony as an exception under Rule 804(b)(5).[12] This rule provides that a statement not specifically covered by other exceptions that has sufficient guarantees of trustworthiness, that is evidence of a material fact, and that is more probative than other available evidence, may be admitted if the evidence's introduction serves the general purposes of the rule and the interests of justice. In considering whether to apply this rule, two factors give the court pause.

---

8. *See* discussion *infra* determining that this testimony is not hearsay.

9. The jury was instructed that all four items of testimony were admissible "for the sole purpose of showing the decedent's state of mind as evidence bearing on his good or bad faith." N.T. 455–56.

10. Defendant contends that, since the evidence could also be probative of the fact believed as well as the state of mind of the believer, decedent's statements to his spouse and business partner must be excluded. This is incorrect. *See* J. Moore & H. Bendix, Moore's Federal Practice ' 803(3)[6](1976). If defendant's contention were accepted, the limitation of Rule

803(3) would consume the exception itself and there would be no state of mind exception remaining.

11. In *Nuttall,* decedent's statement that "guess I'll have to go back to work" following a long conversation with decedent's employer was admissible to show he was being forced to go to work, i. e. that he *believed* he was being forced to go back to work.

12. Rule 804(b)(5), identical to Rule 803(24), is intended to cover situations where the declarant is unavailable. *See* Weinstein & Berger, *supra,* ' 803(b)(5)[01].

88

First, the disputed items of testimony that are hearsay would appear to clearly qualify for admission under the state of mind exception. If they did not, that nonqualification itself under the specifically applicable exception might be grounds for excluding under the general exception. *See United Sates v. Oates,* 560 F.2d 45 (2d Cir. 1977) (police reports not qualifying for admission under Rule 803(8) held inadmissible under Rule 804(b)(5) against criminal defendant). Secondly, in each case where Rule 804(b)(5) is invoked, the court is essentially creating a new exception to the hearsay rule. If the hearsay rule is to retain any life, a demand for the creation of a new exception counsels caution and should be granted only where special "trustworthiness" is shown. While notes from an FBI agent's interview, *see United States v. Lyon,* 567 F.2d 777 (8th Cir. 1977), and earlier testimony before a grand jury, *compare United States v. Gonzales,* 559 F.2d 1271 (5th Cir. 1977), *with United States v. Carlson,* 547 F.2d 1346 (8th Cir. 1976), *cert. denied,* 431 U.S. 914, 97 S.Ct. 2174, 53 L.Ed.2d 224 (1977), may have this special trustworthiness, there may not be any special degree of trustworthiness in the testimony of the decedent's spouse and his business partner in an action by the decedent's estate. *See generally United States v. Medico,* 557 F.2d 309 (2d Cir. 1977) (hearsay statements of unconcerned bystanders to a bank robbery). In any event, since Rule 803(3) authorizes the introduction of the items of testimony considered hearsay, there is no reason to create a special exception under Rule 804(b)(5).

Since the evidentiary rulings at trial and the instructions to the jury were correct, the motion for judgment notwithstanding the verdict, or in the alternative for a new trial, will be denied.[13]

---

13. Judgment was entered for the plaintiff in the amount of $125,000 on September 16, 1977.